JUAN PIÑEIRO MANZANO, demandante y recurrido, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número*: R-70-70     *Resuelto*: 29 de enero de 1973

114

*Gilberto Gierbolini, Procurador General, J. F. Rodríguez Rivera, Procurador General Interino, y Peter Ortiz, Procurador General Auxiliar,* abogados del recurrente; *Carlos J. Irizarry Yunqué,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Debemos revocar la sentencia dictada en este caso por el Tribunal Superior, Sala de Ponce, que responsabilizó al recurrente por los daños sufridos por el recurrido provenientes de un fuego en su hogar ocasionado por el menor retardado, Martín Graciani, colocado en dicho hogar por la División de Bienestar Público del Departamento de Salud de Puerto Rico y que no fue removido del mismo por el referido Departamento a petición del recurrido cuando éste "se percató de la tendencia piromaniaca de Martín."

Los hechos pertinentes del caso, según los determinó el tribunal de instancia, fueron los siguientes:

"1. El 3 de julio de 1967 el niño Martín Graciani, prendió fuego intencionalmente a la casa en que vivía, propiedad de Don Juan Piñeiro Manzano y su esposa Doña Justina Cruz, radicada en el número 74. de la Calle F del poblado de Coto Laurel de Ponce.

2. Dicho menor residía con los esposos Piñeiro Cruz en virtud de un 'Convenio de Servicios a prestar en un hogar de Crianza' suscrito entre dichos cónyuges y la División de Bienestar Público del Departamento de Salud del Estado Libre Asociado de Puerto Rico, otorgado dicho convenio por Autoridad de la Ley de Bienestar Público de Puerto Rico, 8 L.P.R.A. secs. 1 al 26.

3. Martín es un niño sordomudo, retardado mental. Aproximadamente 3 años antes de que prendiera fuego y destruyera la casa del matrimonio Piñeiro Cruz, el señor Piñeiro Manzano se percató de la tendencia 'piromaniaca' de Martín. En aquella ocasión pegó fuego al cuarto donde dormía, quemándose la cama, ropa y otros artículos. Desde esa ocasión Don Juan comenzó a hacer gestiones para que la División de Bienestar Público retirara al menor de su hogar. Dichas gestiones consistieron en frecuentes visitas a la oficina local de Ponce de Bienestar Público y cartas al Gobernador de Puerto Rico, todas las cuales resultaron infructuosas y no fue hasta que el menor hubo destruido la casa el 3 de julio de 1967 que la División de Bienestar Público lo retiró.

4. Además de las gestiones mencionadas, Don Juan y su esposa tomaron precauciones para evitar que el niño tuviera acceso a fósforos. Compraron una cocina eléctrica para sustituir la estufa de gas que tenían de manera de no necesitar fósforos en el hogar; construyeron una verja de más de cinco pies de altura para evitar que el niño saliera al vecindario a buscar fósforos; lo vigilaban constantemente."

A base de estos hechos el tribunal hizo las siguientes conclusiones de derecho:

"1. Conforme al Artículo 1803 del Código Civil, 31 L.P.R.A. Sección 5142, el Estado es responsable en daños y perjuicios en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular. El Estado dio su autorización para ser demandado mediante la Ley número 104 de 29 de junio de 1955, 32 L.P.R.A., Sección 3076 y siguientes.

2. No hay duda de que, bajo el citado Artículo 1803, los padres de un menor que causa daños como los causados en este caso serían responsables por dichos daños. *Alvarez* v. *Irizarry,* 80 D.P.R. 63. De la misma manera viene obligado a responder el Estado por la negligencia de sus empleados y funcionarios si éstos actúan en interés de su patrono o para beneficio de éste. *Viuda de Valentín* v. *Estado Libre Asociado de Puerto Rico,* 84 D.P.R. 112.

3. El último párrafo del citado Artículo 1803 dispone:

'La responsabilidad de que trata esta sección cesará cuando las personas en él mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño.'

4. La prueba en este caso no establece diligencia alguna por parte de los funcionarios o empleados de la División de Bienestar Público para atender las múltiples quejas de los esposos Piñeiro Cruz. El hecho de que se pudiera conseguir donde acomodar al niño poco tiempo después de ocurrido el incendio que destruyó la casa de los demandantes es demostrativo de que con la debida diligencia pudieron haberlo logrado mucho antes de que ocurriera el siniestro."

El recurrente ha relacionado en su petición de revisión siete apuntamientos de errores cometidos por el tribunal de instancia. A los fines de resolver sólo es necesario considerar el primero al efecto de que dicho tribunal incidió al no desestimar la demanda "ya que la función del Estado al determinar si debe remover o no un menor, cuándo y cómo se debe efectuar, es una función de carácter discrecional", no habiendo autorizado el Estado que se le demande en el desempeño de tal función. (32 L.P.R.A. sec 3081(b); 8 R.&R.P.R. sec. 10–3(c) (11)).

El Art. 6(b) de la Ley Núm. 104 de 29 de junio de 1955 que autoriza reclamaciones y acciones contra el Estado Libre Asociado dispone que:

"Nada en las secs. 3077 a 3084 de este título ni en la sec. 5142 del Título 31 autoriza las acciones por daños y perjuicios contra el Estado por acto u omisión de un funcionario, agente o empleado:

(b) en el desempeño de una función de carácter discrecional, aun cuando hubiere abuso de discreción:. . . ." (32 L.P.R.A. sec. 3081 (b)).

Esta disposición está calcada de la Ley Federal de Reclamación por Daños y Perjuicios (the Federal Tort Claims Act —28 U.S.C.A. 2680 (a)).

En *Dalehite* v. *United States*, 346 U.S. 15 (1953) se confirmó la sentencia del Tribunal Federal de Apelaciones para el Quinto Circuito que al revocar la sentencia de un Tribunal de Distrito, desestimó la demanda contra los EE. UU. por los daños sufridos por Dalehite con motivo de la explosión de fertilizantes con base de nitrato de amonia, en Texas City. Se alegó que el Gobierno fue negligente al permitir el almacenamiento en una área de alta densidad poblacional de un material sin investigar su naturaleza y sin aviso de la posibilidad de explosión bajo determinadas circunstancias. Concluyó el tribunal de instancia que la decisión a nivel del Gabinete del Presidente de los EE. UU. de establecer él programa de exportación de dicho fertilizante constituyó un ejercicio de discreción; que la experimentación adicional con el material para determinar la posibilidad de su explosión bajo condiciones de embarque y su combustilidad era un asunto a ser determinado mediante el ejercicio de la discreción por los encargados de la producción. Toda la operación y especificaciones concernientes a la manipulación del material en armonía con el plan adoptado al más alto nivel, requería el ejercicio de discreción. Por lo tanto, el tribunal concluyó que el caso caía bajo la exclusión de responsabilidad provista por la referida ley con respecto a errores en administración o en el ejercicio de funciones discrecionales. Dijo el tribunal que la historia legislativa de la referida ley demuestra que no fue la intención del Congreso que se hiciese responsable al Gobierno por actos de naturaleza o función gubernamental, es decir, de una actividad autorizada de carácter discrecional, a pesar de

ser realizada negligentemente y que envuelve un abuso de discreción.

La norma establecida en *Dalehite*, supra, no ha sido modificada desde entonces e impera en los tribunales federales. *Maynard* v. *United States*, 430 F.2d 1264 (9th Cir. 1970).

En *Smith* v. *United States*, 330 F.Supp. 867 (USDC Mich. 1971), se desestimó la demanda de daños sufridos por el demandante al ser herido por un disparo hecho por un miembro de la Guardia Nacional ordenada a disolver un motín en Detroit. Se alegó que el Gobierno Federal fue negligente (1) al no determinar la preparación de la Guardia para la función de controlar motines antes de federalizarla, (2) al no formular reglas que evitaran el disparo negligente de armas de fuego y (3) al no supervisar los soldados adecudamente y al emitir órdenes vagas y ambiguas a los soldados con respecto a personas localizadas como lo estaba el demandante y (4) en vista de que un miembro de la Guardia negligentemente disparó e hirió al demandante.

Concluyó el tribunal que las circunstancias del caso caen directamente bajo la exclusión de responsabilidad por el ejercicio de una función discrecional por parte de una agencia federal o un empleado del Gobierno independientemente de que se abuse de la discreción. K. C. Davis, *Administrative Law Treatise*, Sec. 25.11.

██ Dijo este último tribunal, citando de *Dalehite*, supra, que la exclusión de la función discrecional "incluye otras funciones en adición a la iniciación de programas y actividades. Incluye, además, las determinaciones hechas por ejecutivos o administradores al adoptar planes, especificaciones o listas de operaciones. Donde hay oportunidad para ejercer un juicio y decisión con respecto a la norma o política a seguir, existe el ejercicio de discreción. Necesariamente acontece, por consecuencia, que los actos de subalternos al llevar a cabo las operaciones del gobierno de acuerdo con directrices oficiales, no pueden estar sujetos a reclamación. De no ser así, la protec-

ción de la Sec. 2680 (a) resultaría inefectiva en el momento de necesitarse, esto es, cuando un subalterno realiza o deja de llevar a cabo, una medida, cada acción u omisión siendo dirigida por el superior, mediante el ejercicio, quizás mediante el abuso de la discreción."

El menor Graciani cuyos actos han dado lugar a la reclamación en este caso fue colocado junto con sus tres hermanos en el hogar del demandante en diciembre 1959 bajo el programa de Hogar de Crianza de acuerdo con lo dispuesto en la Ley de Bienestar Público de Puerto Rico (8 L.P.R.A. secs. 1–26). La Sec. 10 de dicha ley dispone que a la División de Bienestar Público creado por dicha ley le han sido asignadas, entre sus distintas funciones, la de:

Sec. 10 (d) (2), 8 L.P.R.A.

"Aceptar niños dependientes o abandonados, puestos bajo su custodia por el Tribunal Superior. También podrá aceptar, de padres o parientes, niños que después de la debida investigación se determine necesitan su cuidado. Los niños que así se reciban estarán bajo la dirección de la División y serán colocados en hogares de crianza, incluyendo hogares subvencionados y no subvencionados, y hogares adoptivos, o en uno de los Hogares Estaduales para Niños. La División retendrá la custodia y la dirección de cada niño que reciba hasta que sea éste devuelto a sus padres o a uno de ellos; a sus parientes, puesto en libertad por no necesitar ayuda por más tiempo; adoptado o puesto por una Sala de jurisdicción competente bajo otra custodia o dirección. Será, además, deber de la División proveer servicios sociales a la familia del niño puesto bajo su custodia, con el objeto de conseguir el regreso del niño a su propio hogar tan pronto sea posible."

■ Dicha Ley define el Hogar de Crianza (8 L.P.R.A. sec. 68 (5), Supl. Acumulativo 1972), así:

"(5) Hogar de crianza es el hogar de una familia que se dedique al cuidado de no más de 6 niños, provenientes de otros hogares o familias, durante las 24 horas del día, con o sin fines pecuniarios."

· El Reglamento sobre Hogares de Crianza provee (8 R.&R.P.R. sec. 10–3 (c) (11) ) que:

"(11) Los padres de crianza también deben entender que en ningún momento pueden exigir la separación inmediata de un niño colocado en su hogar. Puede ocurrir que la agencia no esté preparada en el momento para asumir la responsabilidad que el cuidado del menor conlleva. Además, es posible que el cambio súbito afecte la estabilidad emocional del niño. Los padres de crianza deben mantenerse en contacto frecuente con el trabajador social e informarle sobre las dificultades que el niño les ocasiona. Así el trabajador social se percata de la necesidad de remover al niño del hogar y tiene la oportunidad de hacer, con tiempo, los arreglos necesarios. Lo anterior no priva, sin embargo, al trabajador social de efectuar una remoción rápida del niño cuando así lo exigen situaciones de emergencia o imprevistas. Los padres de crianza deben aceptar que la agencia puede remover al niño del hogar en el momento que así se considere conveniente para su bienestar."

Como indica el Procurador General correctamente, la prueba demuestra que en 1967 ". . . luego de investigaciones exhaustivas, fueron removidos del hogar los menores Daniel y Víctor Manuel. Ello se debió a problemas de conducta por parte de dichos menores y por entenderse que los padres no podían controlar la conducta y bregar con los problemas psicológicos que presentaban. En cuanto a Martín, allá para mayo de 1967 es que surgen por primera vez las quejas sobre su estado mental y propensión a pegar fuegos. El 3 de julio de 1967 es que ocurre el fuego alegadamente pegado por Martín que dio lugar a esta acción. Luego de varios exámenes, investigaciones e informes fue removido del hogar de los demandantes el 8 de noviembre de 1967."

Aparece de la prueba además, que ". . . no hay constancia oficial clara de que antes del fuego la familia Piñeiro hubiera hecho una solicitud formal sobre la remoción de Martín. Sí hay indicios de que se puso en conocimiento de los funcionarios la alegada tendencia de pegar fuego. En cuanto a ello hay unas notas en manuscrito con fecha de mayo del 1967 en

el sentido de que se le dieron instrucciones al demandante sobre como bregar con él y tratar de contenerlo. Se desprende, además, que Martín recibió tratamiento para su condición de retardado mental en un Hospital del Distrito de Ponce y el Centro Pediátrico de Santurce."

No aparece que en algún momento el demandante radicase con la referida División una solicitud formal para que se removiese al menor en cuestión de su hogar.

Es evidente que de acuerdo a la legislación y reglamentos que la gobiernan, la División de Bienestar Social, antes de colocar al menor en un hogar de crianza o de removerlo de uno y trasladarlo a otro o a una Institución, que provea adecuadamente para su bienestar, tiene que (1) realizar determinadas investigaciones con respecto a las condiciones y facilidades del hogar o institución y de los que lo poseen; (2) llevar a cabo exámenes mentales y físicos del menor que sean necesarios; y (3) justificar la acción que tome sobre cada menor mediante los informes pertinentes. Es obvio que todos estos pasos requieren un cuidadoso ejercicio de la discreción administrativa.

▎ Aún en el caso de que los funcionarios de la División no hubiesen atendido con prontitud las quejas del demandante con respecto a la referida propensión del menor Graciani, su negligencia en no atender tales quejas constituiría un abuso de discreción que igualmente es una actuación excluída expresamente de entre aquellas en relación con las cuales el Estado Libre Asociado ha autorizado a que se le demande, (32 L.P.R.A. sec. 3077 y 3081(b)), no obstante lo criticable, inapropiado y perjudicial que tal abuso de discreción fuese o hubiese resultado.

En vista de lo expuesto *debe revocarse la sentencia dictada en este caso y desestimarse la demanda.*

Los Jueces Asociados, Señores Martínez Muñoz y Martín, disienten.