JUAN PIÑEIRO MANZANO, demandante y recurrido, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* R-70-70      *Resuelto:* 12 de noviembre de 1974

*J. F. Rodríguez Rivera, Procurador General Interino,* y *Peter Ortiz, Procurador General Auxiliar,* abogados del recurrente; *Carlos J. Irizarry Yunqué* y *Jaime H. Juliá Martínez,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

EN MOCIÓN DE RECONSIDERACIÓN

A instancia del recurrido Juan Piñeiro Manzano y en el desempeño de nuestra función de exponer el Derecho fijando el significado y alcance de la ley positiva, hemos acordado examinar de nuevo los límites de la inmunidad conferida al Estado Libre Asociado por los actos u omisiones de sus funcionarios o empleados en el ejercicio de una función de carácter discrecional. Ley de Reclamaciones Contra el Estado Núm. 104 de 29 de junio de 1955, Art. 6(b), 32 L.P.R.A. sec. 3081(b).

La opinión que emitimos en 101 D.P.R. 113, revocó la sentencia dictada en este caso por el tribunal de instancia imponiendo responsabilidad al Estado Libre Asociado por los daños ocasionados al recurrido Piñeiro Manzano como consecuencia del fuego provocado por el menor Martín Graciani, quien vivía con él en virtud de un "Convenio de Servicios a Prestar en un Hogar de Crianza" suscrito por el recurrido y la División de Bienestar Público. Consideramos allí que la función de remover a un menor de un hogar de crianza es una de carácter discrecional expresamente excluida del ámbito de la mencionada Ley Núm. 104. Estuvimos equivocados en nuestra interpretación y expondremos a continuación nuestros fundamentos.

El Art. 6(b) de la Ley Núm. 104 excluye en términos muy escuetos las funciones discrecionales, disponiendo al efecto que:

"Nada en esta ley autoriza las acciones por daños y perjuicios contra el Estado por acto u omisión de un funcionario, agente o empleado:

.          .          .          .          .          .          .          .

(b) en el desempeño de una función de carácter discrecional, aun cuando hubiere abuso de discreción.

.          .          .          . .          .          .          .          ."

El historial legislativo de esta disposición es escaso y no provee siquiera un punto de partida que nos ayude a delimitar sus linderos. Encontramos, sin embargo, exclusiones análogas en la Ley Federal de Reclamaciones de Daños y Perjuicios, 28 U.S.C.A. sec. 2680(a), y en diversas leyes estaduales que reglamentan las demandas contra el Estado, las cuales son útiles para la interpretación de nuestra ley.

■ Como sucede frecuentemente en la interpretación de estatutos, un enfoque literalista en este caso frustraría los propósitos de la Ley 104. El Art. 6(b) excluye del ámbito de la ley las funciones de carácter discrecional pero no las define. El concepto "función discrecional" es muy amplio y, si nos atuviéramos a su significado literal, estaríamos excluyendo de responsabilidad la mayoría de las actuaciones que el legislador quiso incluir al autorizar demandas contra el Estado, puesto que prácticamente toda actuación humana exige algún ejercicio de discreción. La actividad gubernamental comprende diversas clases de actuaciones discrecionales. Desde la formulación de programas y normas básicas de política pública a los distintos niveles de gobierno—superiores e inferiores—hasta el ejercicio de discreción limitado y rutinario.

■ El objetivo general de la Ley 104 de autorizar demandas contra el Estado conflige en cierta medida con el objetivo particular del Art. 6 de excluir cierto tipo de demandas como las derivadas de las funciones discrecionales. Ambos objetivos deben tomarse en consideración y, hasta donde sea posible, debe establecerse un balance adecuado entre uno y otro al

fijarse el alcance de la exclusión. Esta es precisamente una de las disposiciones que más controversia ha causado en la interpretación de la Ley Federal. *Harper and James: 2 The Law of Torts*, pág. 1677, sec. 2914 (1956); Peck: *The Federal Tort Claims Act: A Proposed Construction of the Discretionary Function Exception*, 31 Wash. L. Rev. 207, 209 (1956); Comentario: *The Discretionary Function Exception in the Federal Tort Claims Act*, 52 Mich. L. Rev. 733, 734 (1954).

■ Las dificultades que apuntamos impiden formular normas precisas y abarcadoras para la aplicación de la exclusión en todos los casos. Estamos en un área en que la función judicial más bien consiste en formular criterios y señalar los factores que deben evaluarse de acuerdo con las circunstancias particulares de cada caso. "El trazar la línea precisa de demarcación en esta área requiere la aplicación del método casuístico.", observa previsoramente un eminente tratadista. Davis: 3 *Administrative Law Treatise*, 491, sec. 25.13 (1958). En igual sentido se pronuncia el profesor Jaffe: *Suits Against Governments and Officers: Damage Actions*, 77 Harv. L. Rev. 209, 238.

■ Como punto de partida debe tenerse presente el fundamento racional de la exclusión. Ella toma raíz en la doctrina de separación de poderes. James: *The Federal Tort Claims Act and the Discretionary Function Exception: The Sluggish Retreat of an Ancient Immunity*, 10 U. Fla. L. Rev. 184; Reynolds: *The Discretionary Function Exception of the Federal Tort Claims Act*, 57 Geo. L.J. 81, 121. Salvo en el ejercicio de la función constitucional de revisar las actuaciones de las otras ramas de gobierno en casos apropiados, la Rama Judicial generalmente se inhibe de intervenir con las funciones discrecionales de dichas ramas en la formulación de normas de política pública y de programas de gobierno. Esta es una materia en que, como sabemos, se reconoce amplia libertad de acción a las ramas políticas del Estado. De ahí que aunque no existiera

la exclusión en la ley, los tribunales podrían siempre llegar al mismo resultado mediante la aplicación de la doctrina de separación de poderes. Harper and James, *op. cit.* supra, pág. 184; Davis, *op. cit.* supra, pág. 849, Comentario: *The Discretionary Function Exception in the Federal Tort Claims Act, op. cit.* supra, a la pág. 739. A este respecto, se señala que el estatuto del estado de Nueva York no contiene una exclusión para las funciones discrecionales, y, sin embargo, se ha impuesto por interpretación judicial. *Alva Steamship Co.* v. *City of New York,* 405 F.2d 962 (1969).

En armonía con el fundamento racional de la exclusión pueden identificarse fácilmente ciertas áreas de funciones discrecionales que tradicionalmente han sido protegidas por el manto de inmunidad. No se disputa la inmunidad, por ejemplo, a las funciones de reglamentación del Estado, a las funciones adjudicativas, las legislativas y a las cuasi judiciales. Por otro lado, tampoco debe haber dificultad en reconocer la responsabilidad del Estado por actos negligentes de sus funcionarios y empleados en el ejercicio de funciones discrecionales rutinarias que en nada afectan los programas de gobierno o las normas básicas de política pública.

Algunos han sugerido como criterio para aplicar la exclusión una distinción entre aquellas decisiones básicas de política pública necesarias para determinar la iniciación de proyectos, localización, métodos y lineamentos generales de los mismos, y, las decisiones subordinadas necesarias para llevarlos a cabo. Harper and James, *op. cit.* supra, a la pág. 187. Esta distinción es similar a la formulada en *Dalehite* v. *United States,* 346 U.S. 15 (1955), con respecto a la inmunidad de las decisiones gubernamentales tomadas en la esfera de planificación y las decisiones relativas a la esfera operacional. Allí se expresó a la pág. 42:

"En resumen la alegada negligencia no impone responsabilidad al gobierno. Las decisiones fueron tomadas en el cumplimiento de un deber en la esfera de planificación más bien que en

la esfera operacional y envuelven consideraciones más o menos importantes para la viabilidad del Programa Gubernamental de Fertilizantes." (Traducción nuestra.)

La distinción es, sin duda, útil como guía pero no como criterio único ya que hay situaciones en que resulta difícil el establecer si determinada actuación pertenece a un área o a la otra. Por otro lado, hay actuaciones meramente operacionales en el área de planificación y viceversa. Peck, *op. cit.* supra, a la pág. 219; Reynolds, *op. cit.* supra, a la pág. 404–405.

La jurisprudencia ha refinado esta distinción elaborando criterios más específicos. Se definen las actuaciones al nivel de planificación como aquellas que envuelven determinaciones generales de política pública. O sea, aquellas que requieren la evaluación de factores tales como los efectos políticos, económicos y sociales de un plan o de un programa. Las actuaciones operacionales son aquellas que envuelven asuntos rutinarios, "la operación normal de día a día del gobierno". Reynolds, *op. cit.* supra, a la pág. 105–107. *Swanson* v. *United States*, 229 F.Supp. 217, 220 (1964); *Hendry* v. *United States*, 418 F.2d 774, 782–784 (1969). Véase además la Monografía: *"Federal Tort Claims Act: Construction of Provision Excepting Claims Involving Discretionary Function or Duty"*, 99 A.L.R.2d 1016, 1024.

También la jurisprudencia ha formulado algunas reglas que facilitan interpretar el alcance de la inmunidad. Al respecto, se ha establecido que la decisión de aplicar una norma básica de política pública a un caso específico no está protegida por la exclusión. *White* v. *United States*, 317 F.2d 13 (1963), *Reynolds*, supra, a la pág. 106.

Una variación de esta regla es la del "Buen Samaritano" aplicada en *Indian Towing Co.* v. *United States*, 350 U.S. 61 (1955), al efecto de que una vez el Gobierno decide tomar un curso de acción ya sea proveyendo un servicio o de otra forma tiene que ejercer el debido cuidado aun cuando originalmente

no tuviera la obligación de actuar. Los siguientes casos ilustran la aplicación de estas reglas a diferentes situaciones de hechos: *Costley* v. *United States*, 181 F.2d 723, 725 (1950); *Somerset Seafood Co.* v. *United States*, 193 F.2d 631, 635 (1951); *Eastern Air Lines* v. *Union Trust Co.*, 221 F.2d 77 (1955); *Fair* v. *United States*, 234 F.2d 288, 294 (1956); *Seaboard Coast Line Railroad Co.* v. *United States*, 473 F.2d 714, 716 (1973); *Gibson* v. *United States*, 457 F.2d 1391, 1394 (1972).

■ Advertimos que la jurisprudencia no ha seguido un patrón consistente en la aplicación de estas reglas. Pero, en términos generales podemos derivar como principio fundamental de interpretación la distinción entre el ejercicio de discreción en la formulación de normas de política pública básica y el ejercicio de discreción meramente rutinario.

■ Merece especial atención por guardar sus hechos estrecha semejanza con el de autos el caso de *Johnson* v. *United States*, 73 Cal. Reptr. 240, 447 P.2d 352 (1968). En dicho caso la agencia gubernamental colocó a un menor de 16 años de edad en un hogar de crianza sin advertirle a los padres de crianza que el menor tenía tendencias homicidas y un historial de violencia y crueldad. El menor agredió a la madre de crianza y ésta demandó al estado de California. La defensa aducida por el Estado consistió en que el funcionario que hizo los trámites para colocar al menor en el hogar de crianza ejerció su discreción con respecto a la información que debió adelantar sobre el menor. Al imponer responsabilidad al Estado el tribunal puntualizó como factores para interpretar el alcance de la exclusión de actos discrecionales: 1) la importancia para el público de la función discrecional envuelta, 2) hasta dónde la imposición de responsabilidad puede menoscabar el libre ejercicio de esa función y 3) la disponibilidad de otros remedios a las personas afectadas.

Aplicando estos factores el tribunal concluyó que la decisión del funcionario con respecto a las advertencias que

debía hacer a los padres de crianza no constituían el tipo de decisión básica de política pública cubierta por la exclusión de responsabilidad. Consideramos útil este enfoque de *Johnson* porque destaca la importancia de los factores de política pública envueltos en la determinación de inmunidad por encima de una interpretación literal del estatuto.

■ Se recordará que en nuestra opinión original, 101 D.P.R. 113, decidimos que la remoción del menor del hogar de crianza constituía una función de carácter discrecional por requerir la misma "un cuidadoso ejercicio de la discreción administrativa", interpretando así literalmente el estatuto. Es evidente que la decisión de remover al menor requería ejercicio de discreción por diversos funcionarios. Pero no es éste el tipo de decisión de política pública básica protegida por la exclusión. Ella no efecta en forma alguna el Programa de Hogares de Crianza ni la política pública encarnada en la Ley de Bienestar Público, 8 L.P.R.A. secs. 1–26.

Es por eso que consideramos equivocada nuestra conclusión considerando función discrecional la remoción del menor. Esto, sin embargo, no dispone automáticamente la revocación de nuestra sentencia.

■ Una vez concluido que la función aquí envuelta no está protegida por la exclusión estatuida en el Art. 6(b), *supra*, es necesario considerar ahora si en el desempeño de la misma los funcionarios o empleados del Estado Libre Asociado fueron o no negligentes.

El tribunal de instancia concluyó al respecto que:

"Martín es un niño sordomudo, retardado mental. Aproximadamente tres años antes de que prendiera fuego y destruyera la casa del matrimonio Piñeiro Cruz, el señor Piñeiro Manzano se percató de las tendencias piromaníacas de Martín. En aquella ocasión pegó fuego al cuarto donde dormía, quemándose la cama, ropa y otros artículos. Desde esa ocasión Don Juan comenzó a hacer gestiones para que la División de Bienestar Público retirara el menor del hogar. Dichas gestiones consistieron en frecuentes visitas a la oficina local de Ponce de Bienestar

Público y cartas al Gobernador de Puerto Rico, todas las cuales resultaron infructuosas y no fue hasta que el menor hubo destruido la casa el 3 de julio de 1967 que la División de Bienestar Público lo retiró".

El examen que hemos hecho del récord no sostiene tal conclusión. La prueba desfilada consistió en el testimonio del propio reclamante Piñeiro Manzano de un lado y el testimonio de la Srta. Xenia Acevedo Gordils, quien estaba a cargo de la Unidad de Hogares de Crianza y Anexos desde abril de 1967. El expediente de la Oficina de Bienestar Público número S-10771 se admitió en evidencia por estipulación de las partes.

El mencionado expediente recoge en forma minuciosa y esmerada el historial del menor Martín y sus tres hermanos. Aparecen en el mismo anotaciones en puño y letra de las múltiples visitas de las trabajadoras sociales al hogar de crianza y de los padres de crianza a la Oficina de Bienestar Público en Ponce. Las anotaciones detallan los propósitos de las visitas, las observaciones pertinentes sobre el estado de los menores, del hogar y de los padres de crianza, los problemas surgidos y las gestiones pertinentes para resolverlos. A través del expediente se percibe un profundo sentido humano y un loable esfuerzo en beneficio del mejor bienestar de los menores conforme a las circunstancias de cada uno de ellos.

Se trata de cuatro hermanos de nombres Daniel, Manuel, Martín y María Consuelo Graciani que allá para el 1959 fueron colocados en el hogar de crianza del recurrido Piñeiro Manzano en virtud de un contrato de servicios. Para esa fecha los menores contaban la edad de 10, 8, 6 y 4 años y medio respectivamente.

La primera visita de supervisión al hogar de crianza del recurrido Piñeiro Manzano se efectuó en diciembre de 1959. Entre los años de 1959 a 1965 inclusive se efectuaron visitas periódicas de supervisión al hogar de crianza, se hicieron exámenes médicos a los menores, se les vacunó en la Unidad de Salud Pública y se matriculó a Daniel y a Manuel en la Es-

cuela de Coto Laurel. Martín recibía periódicamente trata-
miento médico en la Clínica de Niños Lisiados. No aparece en
el expediente una sola queja sobre Martín ni solicitud alguna
para su remoción durante este período.

En el período comprendido entre febrero de 1966 a enero
de 1967 se efectuaron siete visitas de supervisión, se entre-
vistó a los padres de crianza en la Oficina de Bienestar Pú-
blico en cinco ocasiones y se visitó la escuela de Coto Laurel.
Es en este período que aparece por primera vez que los padres
de crianza se quejan de problemas de conducta de Daniel y
Manuel y piden la remoción de éstos. Nótese que no se pide
la remoción de Martín. Sobre éste sólo aparece del récord que
"Conviene señalar que en dos ocasiones este menor a [sic]
pegado fuego en la propia casa. Se le ha dado orientación a
los padres de crianza para que tomen las medidas necesarias
al respecto."

Manuel fue removido en marzo de 1967 al Hogar de Niños
de Guaynabo.

La carta dirigida al Gobernador por el recurrido Piñeiro
Manzano el 18 de febrero de 1967 solicitó únicamente la remo-
ción de Daniel y Manuel pero no la de Martín, contrario a lo
concluido por el tribunal de instancia.(¹) Nótese que estamos

(¹) Dicha carta lee:
"Coto Laurel P.R.
18 de Feb. 1967
Hon. Señor Gobernador
Don Roberto S.V.

Señor estamos solicitando de usted nos allude a rresolver dos proble-
mas, el primero es el siguiente. Tenemos muchachos del vien estar público
son hermanos los dos mayores no se rrespetan siempre están peleando, el
mayor tiene cerca de catorce años ninguno quiere hir a la escuela, tienen los
muebles tapizados destruhidos el zofá picado el forro con cuchillo las dos
puertas con los paneles rotos y la perciana doblada, el mayor le dió un tajo
en la cara al otro en el lavio superior está marcado para ciempre éste
Daniel lo pueden pasar al Instituto de guainabo allí puede aprender algon
en usted espero lo rretire de aquí cuanto antes, el está bien equipado de
rropa y cinco pares de zapatos entre ellos tres nuevos.

2o. Problema de aquí Ponce nos mandaron a llebar un niño rretardado
al Edificio anterior, de la lotería en Santurce, el médico encargado rreco-

ya en febrero de 1967—el fuego fue el 3 de julio—y no ha habido todavía solicitud alguna para la remoción de Martín.

El 17 de mayo de 1967 se recibió en la Oficina de Bienestar Público un anónimo quejándose de que los padres de crianza dejaban al menor Martín suelto en la calle sabiendo que era anormal y que el niño se pasaba prendiendo fósforos a la basura por los patios. El 22 de mayo el recurrido Piñeiro Manzano se presentó a la Oficina de Bienestar Público a pedir que removieran a Daniel, quejándose que éste no asistía a la escuela, no respetaba a nadie en el hogar y se iba desde por la mañana y no regresaba hasta por la noche. El propósito de la visita fue quejarse de la conducta de Daniel y pedir la remoción de éste. No presentó queja alguna sobre Martín ni pidió su remoción. Al informarle la trabajadora social sobre el anónimo fue que el recurrido expresó que debía hacerse algo inmediato por los menores.

Es significativo que todas las peticiones de remoción de Daniel y Manuel aparecen anotadas en el expediente. Sin embargo, no aparece una sola anotación antes del fuego sobre solicitud alguna de remoción de Martín. La inferencia más lógica y confiable es que ninguna se hizo. El tribunal de instancia descartó el valor probatorio de un récord objetivo, cuidadosamente anotado cuando no había el más remoto indicio

---

mendó llebarlo a una Institución yendo nosotros a verlo y llebarle lo que se necesite, el niño está entrado en once años y demuestra ser Inteligente. Muy a menudo está bocceando con sacos llenos de basura, y sacando tornillos con llaves de máquinas viejas que alla en la basura del rio, como se arreglan estos muchachos es separando uno del otro y no hemos podido conseguir separarlos, en ud. esperamos nos allude a resolver este problema.
Gracias anticipadas
Agustina Negrón de Piñeiro
Calle F-774 Coto Laurel Ponce
    Para llevar el rretardado a Santurce nos citaron para los ocho de la mañana, debido a la hora temprana nos tuvimos que hir un día antes, la casa quedó sola tuvimos que llebarnolos todos esto originó un gasto que pasó de cincuenta y seis pesos. El carro cobró hida $16.00 y bulta igual, la dieta de todos nosotros es el rremanente. El retardado se llama Martín Graciani Rodríguez."

de pleito, para darle completo crédito al testimonio del recurrido, quien a fin de cuentas es parte interesada.

Tampoco es correcta la conclusión del tribunal de instancia al efecto de que:

"Del propio expediente se evidencia la gran preocupación que tenían los esposos Piñeiro Cruz por la condición de Martín y se evidencia a su vez que nada se hizo para remediar la situación. De un informe especial suscrito por la trabajadora social Ivonne Santiago que forma parte del expediente se hace constar lo siguiente:

'Anteriormente este menor había provocado dos fuegos los cuales habían podido ser sofocados.'

'Deseamos aclarar que los padres de crianza se habían movido en otras ocasiones a la oficina en interés de que le removieran este menor por los problemas que estaba presentando.'

'El señor Antonio Rivera, vecino de la familia Piñeiro vino a informar que el menor había intentado prender fuego nuevamente.' " (Conclusión número cinco.)

Las anotaciones del expediente revelan que desde el 1962 Martín venía recibiendo tratamiento en la Clínica de Niños Lisiados y en la Clínica de Psiquiatría de Ponce; que fue referido al Programa pro-Terapia del Habla; que fue examinado por el neurólogo y el otorrinolaringólogo, y, que fue evaluado como un niño retardado mental y, por esa razón, no elegible para entrar al Colegio San Gabriel. (Carta dirigida el 2 de febrero de 1967 por el Centro Pediátrico de Niños Lisiados de Santurce a la Oficina de Bienestar Público en Ponce.)

El informe de la trabajadora social Ivonne Santiago, que cita el tribunal de instancia en la anterior conclusión fue redactado el 28 de julio de 1967 después del fuego. No es correcta su aseveración de que "los padres de crianza se habían movido en otras ocasiones a la oficina en interés de que le removieran este menor . . . ." Como ya vimos, todas las gestiones de los padres de crianza se referían a Daniel y Manuel, los cuales fueron removidos al Hogar de Niños de Guaynabo.

Por otro lado, aunque el recurrido hubiese solicitado la remoción de Martín en la visita que hizo el 17 de mayo a la Oficina de Bienestar Público, no podría concluirse por ese mero hecho que se incurrió en negligencia. La remoción no puede llevarse a cabo precipitadamente porque el cambio súbito puede afectar la estabilidad emocional del menor. No debe perderse de vista que este menor se colocó en la casa del recurrido cuando tenía cuatro años de edad en el 1959 y que logró en dicho hogar cierto progreso sobre su innata condición. Es por eso que la remoción requiere que se lleven a cabo investigaciones sobre las condiciones y facilidades del hogar o de las instituciones disponibles, exámenes mentales y físicos del menor, y, en caso necesario, que se ayude al menor con terapia adecuada a ajustarse al cambio. Estas gestiones requieren tiempo. En el caso de autos no pudieron llevarse a cabo hasta noviembre de 1967, a pesar de las múltiples presiones creadas después del fuego. Todas las gestiones para acomodar al menor en un hogar o institución adecuada resultaron infructuosas debido a que éste, por su condición, no reunía los requisitos. (Véase carta de 18 de octubre de 1967 de la trabajadora social Ivonne Santiago a la Oficina del Gobernador.)

Concluimos que en las circunstancias de este caso el tiempo transcurrido entre la supuesta solicitud de remoción y la fecha del incendio, apenas mes y medio, es insuficiente para imputarle negligencia al Estado.

*Se dictará sentencia declarando sin lugar la moción de reconsideración.*

El Juez Asociado, Señor Martín, concurre en el resultado. El Juez Asociado, Señor Irizarry Yunqué, no interviene.