Manuel Soto Rivera et als., demandantes y recurrentes, *v.* José Ayala Amely et als., demandados y recurridos.

*Número:* RE-89-160          *Resuelto:* 28 de diciembre de 1992

*Waldo Santiago Irizarry,* de *Bufete Silva & Santiago,* abogado de los recurrentes; *Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General,* y *Sylvia A. Cancio Bigas, Procuradora General Auxiliar,* abogados del Estado Libre Asociado.

## SENTENCIA

Recurren ante nos los demandantes recurrentes del epígrafe de aquella parte de la sentencia del foro de instancia que declaró sin lugar su demanda en daños y perjuicios con respecto al Estado Libre Asociado de Puerto Rico.

Estudiados y analizados los autos, así como los alegatos de las partes, se dicta sentencia para modificar la dictada por el foro de instancia. En las circunstancias de este caso, el Estado debe responder como cocausante por los daños sufridos por los demandantes. Por ello se dispone que el Estado Libre Asociado es deudor solidario de la indemnización impuesta por el foro de instancia en su sentencia, excepto en el pago de los honorarios de abogado.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió una opinión de conformidad y concurrente. La Juez Asociada Señora Naveira de Rodón está conforme con la sentencia. El Juez Asociado Señor Hernández Denton está conforme con la sentencia y se une a las partes I y II de la opinión del Juez Asociado Señor Fuster Berlingeri. El Juez Asociado Señor Alonso Alonso emitió una opinión de conformidad y concurrente, a la cual se une el Juez Asociado Señor Rebollo López. El Juez Asociado Señor Fuster Ber-

lingeri disintió con una opinión escrita, a la cual se unió el Juez Presidente Señor Andréu García.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión de conformidad y concurrente del Juez Asociado Señor Negrón García.

I

No albergamos duda sobre la responsabilidad del Estado por los daños y perjuicios causados al menor R.M.S.F. por la conducta lujuriosa del Director de su escuela elemental. Resistimos el análisis técnico de evaluarla bajo los pronunciamientos de *Piñeiro Manzano v. E.L.A.*, 102 D.P.R. 795 (1974).

No se cuestiona la ocurrencia de los actos lascivos e impúdicos del Director del referido plantel elemental. Tampoco está en controversia que existían claros indicadores de ese tipo de comportamiento, unido a una actitud laxa de su parte y tolerante en cuanto a la disciplina. Su permisibilidad en torno a estudiantes en estado de embriaguez, el uso de palabras obscenas y otros ejemplos de favoritismo así lo evidenciaban. Esta situación no fue producto de una combustión instantánea. Venía ocurriendo desde hace algún tiempo. Fue informada con anticipación y lujo de detalles a las autoridades correspondientes y nada se hizo. Tal situación surgía del *informe* del guardián Francisco Morales Lugo como situación apremiante producto de la conducta homosexual del Director; para todos los fines legales, ese informe constituyó una *denuncia*.

## II

Lisa y llanamente estamos ante una instancia de negligencia por *omisión* en el deber de supervisión que tiene el Departamento de Instrucción Pública. Frente al cuadro fáctico reseñado, no podían cruzarse de brazos las autoridades. *Collado v. E.L.A.*, 98 D.P.R. 111 (1969); *Cruz Costales v. E.L.A.*, 89 D.P.R. 105 (1963).

Como fuente de responsabilidad civil, el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, impone el deber de actuar con prudencia en nuestro diario vivir. El concepto de *previsibilidad* es la base que sostiene el principio de responsabilidad extracontractual. *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 18–19 (1987), y casos allí citados; *Pacheco v. A.F.F.*, 112 D.P.R. 296, 300 (1982). A su vez, la norma de previsibilidad se encuentra regulada por la *razonabilidad*, procurándose así limitar las bases de la responsabilidad a aquellas consecuencias normales y realmente previsibles de la transgresión de una norma jurídica. *Rivera Pérez v. Cruz Corchado*, supra.

Bajo esta óptica, la conducta aquí implicada tenía que evaluarse a la luz de los atributos morales que se espera de directores y maestros escolares. "En términos de moralidad, el maestro debe tratar de ser un modelo de persona moral, esto es, debe guardarse de dar un ejemplo que induzca a adquirir malos hábitos y, además, debe demostrar lo que significa dedicarse positivamente a mejorar la actitud y la conducta de sus semejantes." *Vélez Quiñones v. Srio. de Instrucción*, 86 D.P.R. 755, 762 (1962).

La importancia de ello radica en que "[h]ay una distinción que es necesario establecer entre *los niveles elemental y secundario de enseñanza* y aquél correspondiente a la educación universitaria. La disparidad esencial reside en la función que cumplen sustancialmente uno y otro nivel. Aunque toda labor pedagógica implica la presencia de unas constantes que apuntan hacia *la formación del individuo,*

*lo cierto es que esa etapa formativa se apuntala en los niveles inferiores del aprendizaje. La escuela primaria y la superior establecen los verdaderos fundamentos de la formación del niño.* Conjuntamente con el núcleo familiar y demás manifestaciones del medio social, la enseñanza escolar en esas fases instauran los cimientos del carácter y la conducta que observará el niño en su etapa adulta .... Esta distinción de fases a niveles académicos implica una distinción entre los maestros que dirigen el proceso de aprender. *En las manos del educador de los niveles inferiores, el Estado deposita una responsabilidad altamente delicada. El riesgo involucrado es de naturaleza superior, por lo que se obliga a una selección muy cuidadosa de quién habrá de tener en sus manos tan seria encomienda".* (Énfasis en el original suprimido y énfasis suplido.) *De Paz Lisk v. Aponte Roque,* 124 D.P.R. 472, 501–502 (1989), opinión disidente.

— O —

Opinión de conformidad y concurrente emitida por el Juez Asociado Señor Alonso Alonso, a la cual se une el Juez Asociado Señor Rebollo López.

Concurro con la sentencia de este Foro que determina que el Estado Libre Asociado de Puerto Rico (en adelante E.L.A.), *dados los hechos particulares de este caso*, es responsable por los daños y perjuicios causados a los demandantes. La falta de diligencia, de supervisión y de investigar adecuadamente una querella legítima presentada por un guardia escolar contra un principal de los niveles intermedio y superior de una escuela pública, el cual cometió actos lascivos e impúdicos en el plantel escolar en horas de clase con un menor de catorce (14) años de edad —que aunque no era retardado mental tenía inteligencia catalogada como normal-lenta— y que se encontraba en el

quinto (5to) grado *de escuela elemental* recibiendo educación especial, unida a la omisión de la maestra del menor (la cual se cruzó de brazos ante una conducta de dicho principal que le preocupaba), constituyeron actos negligentes de los funcionarios y empleados del Estado que causaron los daños probados al menor y a su familia.

Examinemos el marco conceptual y jurídico dentro del cual debemos colocar y analizar los hechos de este caso y las controversias que éste suscita.

La Sec. 5 del Art. II de la Carta de Derechos de nuestra Constitución, L.P.R.A., Tomo 1, garantiza el derecho de toda persona *a una educación primaria* que fomente el pleno desarrollo de su personalidad y el fortalecimiento y respeto de los derechos del hombre y de las libertades fundamentales.

Esta disposición proclama el derecho de todos los puertorriqueños a la educación, esto es, al "cultivo de la personalidad para expresar de ella lo más humano, en su mejor realización posible". P. Muñoz Amato, *El derecho a la educación y la libertad académica*, 24 Rev. C. Abo. P.R. 463, 468 (1964). Véase *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720, 737 (1978).

El Reglamento de Estudiantes del Sistema de Instrucción Pública, Departamento de Instrucción Pública, 10 de noviembre de 1988, Preámbulo, dispone que "[l]a aspiración fundamental de la escuela pública puertorriqueña es desarrollar al máximo, y en forma integrada las potencialidades de nuestros educandos para que puedan disfrutar de una vida creadora y productiva, tanto a nivel personal como en sus relaciones con los otros".

*Vano sería el reconocimiento de este derecho constitucional a la educación primaria si el Estado no le garantiza a sus beneficiarios, particularmente en el nivel primario de enseñanza, la protección y seguridad necesarias para su más amplio ejercicio dentro de los planteles escolares.*

Cuando se trata de *niños de tierna edad en el nivel pri-*

*mario de enseñanza* se requiere de las autoridades escolares (el Estado) —bajo cuyo control los padres de dichos menores han puesto a sus hijos— que tomen las medidas cautelares, preventivas y remediativas necesarias, *según las circunstancias,* para velar y proteger la salud y el bienestar de dichos menores. *Este es un deber general de previsión impuesto por las circunstancias particulares y la naturaleza de la función que dichos funcionarios y empleados ejercen, y por la especial condición de indefensión de las personas que tienen a su cargo: nuestros niños.*

La consecución de estos fines impone en las autoridades escolares *en este nivel primario,* como parte del deber de brindar protección a los estudiantes, *la función de investigar adecuadamente* y tratar de esclarecer las imputaciones y querellas que los estudiantes, padres, personal docente y policíaco encargado de la vigilancia de los planteles escolares, sometan a su consideración *sobre bases fundamentadas* relacionadas con la conducta impropia del personal docente, administrativo, etc. de la escuela.

La función investigativa de los organismos rectores del sistema de instrucción pública primario es una actividad relacionada con la *función diaria* de las escuelas bajo su jurisdicción. Esta función resulta de suma importancia para los padres, maestros y demás personal que día a día laboran en la encomiable labor de la enseñanza, pues resulta medular para la prevención de un sinnúmero de posibles problemas en las aulas de nuestro país. De ello depende, en gran medida, el bienestar y la seguridad de los beneficiarios del derecho a la educación que se encuentran rodeados de un ambiente hostil, tanto dentro como fuera de la escuela, reflejo de las realidades sociales actuales.

Debemos fomentar el más eficiente desempeño de esta *labor investigativa.* Los intereses en juego así lo ameritan. De manera alguna, el imponer responsabilidad por la omisión de las autoridades escolares del nivel primario en cumplir diligentemente con este deber menoscaba el libre

ejercicio de dicha función. Al contrario, la imposición de responsabilidad por tal omisión fomenta y promueve su eficiente ejercicio. El Estado, so pena de responsabilidad, deberá exigir su más cabal cumplimiento a sus funcionarios, agentes y empleados.

Frente a los problemas de conducta de los llamados a supervisar y administrar directamente los *planteles escolares primarios* en nuestro país, el único remedio disponible para los demás componentes de la escuela es someter las quejas sobre tal conducta ante las autoridades escolares de mayor jerarquía.

La labor pedagógica es fundamental en la formación del individuo, particularmente en los grados primarios.

Los estudiantes en las escuelas públicas de nivel primario son niños de tierna edad. Su inmadurez, inexperiencia e inocencia los coloca frente a maestros, directores y otro personal escolar en una posición donde la autoridad puede formarlos o deformarlos. Los maestros *son modelos* a los cuales los estudiantes miran como ejemplo. Su influencia en el desarrollo de la personalidad del menor es muy importante. Por ello, el grado de supervisión del Estado sobre quienes tiene a su cargo la delicada encomienda de ayudar a formar el carácter y desarrollar al máximo la personalidad y las potencialidades del niño, en este nivel primario, *es mayor que en otros niveles.*

Examinemos *cuidadosamente* los hechos de este caso, según surgen de los autos y de la prueba que desfiló ante el tribunal de instancia.

## I

El menor R.M.S.F. es un adolescente *que requiere, y ha requerido en el pasado, educación especial.* Su inteligencia ha sido catalogada como normal-lenta. No es retardado mental. Aún así, a la edad de catorce (14) años, cuando ocurrieron los hechos que dieron base a esta acción, se en-

contraba *en el quinto grado* de la escuela elemental y recibía educación especial.

La escuela a la que asistía dicho menor (Escuela Mercado del poblado Rosario en Mayagüez) proveía enseñanza pública para estudiantes de los tres (3) niveles primarios: elemental, intermedio y superior. *El nivel elemental, al cual pertenecía el menor R.M.S.F., estaba a cargo de una directora o principal, y el nivel intermedio y superior a cargo de otra persona.* El codemandado José Ayala Amely (Ayala Amely) *era el principal de los niveles intermedio y superior de la referida escuela.* Ambos principales respondían directamente al Superintendente de Escuelas de San Germán.

Dicha escuela tenía asignado al guardia escolar Francisco Morales Lugo (el guardia). Desde que el guardia, quien era miembro de la Guardia Escolar adscrita al Departamento de Instrucción Pública (hoy Departamento de Educación, Ley Núm. 68 de 28 de agosto de 1990 (3 L.P.R.A. sec. 391 *et seq.*)) llegó a la escuela el 5 de diciembre de 1986, comenzó a confrontar problemas con Ayala Amely, pues siendo uno de los deberes del guardia impedir que personas ajenas al plantel penetraran a su predios,[1] Ayala Amely *traía al plantel jovencitos de catorce (14) años que no eran de la escuela e impedía que el guardia los sacara de los predios.* Según el testimonio del guardia, Ayala Amely tenía, entre algunos estudiantes, reputación de ser homosexual. *El guardia llegó a ver a Ayala Amely "tocándole los cachetes y 'sobando'* a algunos estudiantes varones". Sentencia, pág. 6. Apéndice VIII, pág. 30.

Las diferencias entre el guardia y Ayala Amely rebasaron los meros resentimientos del uno hacia el otro, al punto de que hubo denuncias de Ayala Amely ante la Policía y del guardia ante las autoridades escolares.

El guardia, en específico, remitió el 2 de octubre de 1987

---

[1] *Cf.* Ley Núm. 30 de 16 de mayo de 1972 (33 L.P.R.A. sec. 2091).

un informe extenso al *Director Regional de Mayagüez del Departamento de Instrucción Pública*. En dicho informe el guardia señalaba, *inter alia*, con relación a la conducta de Ayala Amely en el plantel:

Conducta del Sr. Administrador que pude capta[r.]
1– *Toleraba que algunos estudiantes de su preferencia asistieran a la escuela en algunas ocasiones en estado de embriaguez o que habían ingerido bebidas alcoholicas* [sic], *y yo no podía intervenir para poner disiplina* [sic] *porque el* [sic] *me lo prohibia debido a que estos eran sus amigos y no quería disgustarlos.*
2– Noté que algunas jovencitas con problemas de conducta y con problemas con los maestros eran referidas al director y este las trataba *con malas palabras* y las amenazaba con suspenderlas de la escuela sin analizar bien cual [sic] era el motivo del problema, es decir no le daba la importancia que esto tení[a.]
3– *En ocasiones llevé estudiantes a donde el director porque me habían faltado el respeto y este no me daba apoyo ni crédito a mis quejas ocasionando que los estudiantes trataran de burlarse de mi* [sic]. Debido a esta situación me vi obligado a ir donde el Sr. Superindente [sic] a dar la querella. También recibí humillaciones de palabras de padres y madres delante del director y también lo maltrataban a el [sic] y no se atrevía actuar como era debido.

  .    .    .    .    .    .    .    .

6– Tuve acercamiento con ciertas personas supervisores del departamento y le explicaba la problemática y *entonces me contestaban* [q]ue *dejara todas las cosas quietas porque era peligroso ya que supuestamente el Sr.Director pertenecía al partido en el poder y no se podia* [sic] *hacer nada en contra de él.*
7– *En ocasiones tuve que aceptar jovencitos en la escuela porque decían ser sobrinos del director y tenían permiso para permanecer todo el día en la escuela y participar de los beneficios del comedor escolar.En otra ocasión intervine con dos jóvenes de la escuela que habían brincado la verja de la escuela y penetraron en los baños* y procedí a llevarlos al cuartel donde el agente Sr. Seda intervino haciendo *una querella por la ley 30*, antes de hacer la querella se los [sic] comunicamos al director y este dijo que hiciéramos lo que tuvieramos que hacer entonces se procedio [sic] a llevar el caso donde el juez, cando [sic] fuimos citado [sic] a la corte

yo no pude asistir debido a que tuve que asistir a una re-unión al Dept. de Instruccion [sic] en Hato Re[y,] *cuando regresé el agente Seda me informó que el Sr,* [sic] *Director habia* [sic] *ido donde el juez a informar que estos jóvenes tenían su permiso para entrar a la escuela y entonces la denuncia se cayó y lo* [sic] *archivaron sin hacer nada al respecto.*

9– *En ocasiones el director acudía a la escuela con personas ajenas en días y horas fuera de clases.*

10– Le daba quejas sobre vandalismos en la escuela y el [sic] no comentaba ni hacía nada para averiguar o corregir el problema, tambien [sic] pude notar que el director iba a la escuela con una guagua y sacaba sillas y mesas para utilizarlas en actividades que no eran de la escuela.

11– *En una ocasión se acercó a mi* [sic] *un profesor que tenía un problema con un estudiante para que yo lo llevará* [sic] *donde el director, el profesor me indicó que el estudiante le había comentado que el director no se atrevia* [sic] *a decirle nada porque el sabía que el director era homoxesual* [sic]. *Se habló con el director y se hizo una reunión donde estaba el padre del joven, el director, dos maestro* [sic] *y y[o,] entonces el profesor le dijo al director el comentario del estudiante y este se tornó un poco aborchornado* [sic] *y le dijo al estudiante que para el* [sic] *hacer esos comentarios tenía que haber tenido relación con el* [sic] *de esa índole, pero que si él le pedía perdón entonces todo quedaba olvidado y el* [sic] *no le guardaría rencor y todo quedó así.*

Nota:

*de todos estos casos tienen conocimiento algunos supervisores escolares, la policía, el Sr* [sic] *Cruz Beltran* [sic], *Sr* [sic] *Toledo, Sr* [sic] *Efren Rodriguez* [sic] y estos me han solitado [sic] todo por escrito.

Inesperadamente y sin previo aviso el Sr. Toledo me pidió que me necesitaba para trabajar en la escuela Long fellow de San German [sic] donde según el Sr. Toledo tenía problemas con los padres y los estudiantes y el traslado se hizo enseguida. Con este cambio me senti [sic] un poco defraudado porque sé que hize [sic] un buen trabajo en la escuela Laura Mercado del poblado el Rosario y sé que el cambió [sic] se debió a una peticion [sic] del Sr [sic] Ayala director de la escuela porque según el Sr [sic] Toledo Ayala le indicó que no necesitaba guardias en su escuela.Me gustaría ustedes [sic] hicieran una investigación de mi persona en todo el poblado del Rosario, con la policí[a,] con los vecinos y padres, madres y estudian-

tes de dicha escuela. (Énfasis en el original suprimido y énfasis suplido.) Apéndice VII, págs. 27–28.

*Las autoridades escolares no hicieron nada con respecto a este informe del guardia, aunque con posterioridad a los hechos, el Superintendente de Escuelas sostuvo que en dicho informe se hacían "acusaciones muy serias contra el Sr. Ayala Amely". El Superintendente de Escuelas del área no solicitó una investigación de la conducta alegadamente desplegada en la escuela por Ayala Amely porque creía que la denuncia de homosexualidad era "un asunto difícil de probar".* Sentencia, pág. 7. Apéndice VIII, pág. 36. Por el contrario, la respuesta de las autoridades escolares a las quejas del guardia fue trasladarlo a otra escuela el 21 de diciembre de 1987.

Así las cosas, el 20 de enero de 1988, aproximadamente tres (3) meses después de que el guardia rindiera su informe, el menor R.M.S.F. se encontraba en la escuela. Por la tarde, a la hora de salida, se sintió mal pues le dolía el estomago. Caminó hasta la oficina de Ayala Amely, ya que frente a ésta había un cuarto de servicio sanitario, y le pidió permiso a Ayala Amely para usarlo. Ayala Amely le autorizó a usarlo y le manifestó que no se preocupara si la guagua de transporte escolar lo dejaba, pues él lo llevaría en su carro a su casa.

Al cabo de un rato, el menor salió del servicio sanitario. Ayala Amely le preguntó que cómo se sentía. El menor le contestó que aún le dolía "la barriga". Ayala Amely lo invitó a ir con él a su oficina. Una vez allí, Ayala Amely le dijo al menor que se bajara el cierre de cremallera (*zipper*) de su pantalón, a lo que el menor accedió creyendo que Ayala Amely le examinaría "la barriga o el ombligo".

El menor confiaba en Ayala Amely porque éste había dicho que era su amigo, que le quería mucho y que cualquier ayuda que necesitara se la pidiera. *Ayala Amely utilizaba ocasionalmente al menor, en horas de clase, para que*

*le ayudara a repartir papeles a los maestros.* Sentencia, pág. 2. Apéndice VIII, pág. 31.

Tan pronto el menor se bajó el cierre de cremallera de su pantalón Ayala Amely introdujo su mano, le agarró el pene, lo sacó fuera del pantalón y se lo metió en la boca en un acto de copulación oral *(fellatio).* El menor se quedó sorprendido, paralizado, sintió asco, miedo y empujó a Ayala Amely al mismo tiempo que le dijo: "Mister, ¿que le pasa, usted es gay?" Apéndice VIII, págs. 31–32. Ayala Amely le respondió que eso no era nada malo, que era algo que él hacía con otros hombres, que otros hombres se lo hacían a él y que también lo hacía con mujeres. El menor le pidió entonces que lo llevara a su casa, a lo cual Ayala Amely accedió diciéndole que no le contara nada de lo sucedido a su padre (el codemandante Manuel Soto Rivera), pues éste podía matarlo. Sentencia, pág. 3. Apéndice VIII, pág. 32.

El niño guardó silencio sobre lo sucedido hasta el día en que su padre, tras haber recibido información inquietante de una de las maestras de la escuela, decidió confrontar al menor. Resultó que, días después de los hechos, la madre del menor (la codemandante Evelyn Fraticelli Rivera) acudió a la escuela a buscar las notas del menor *y la maestra le comentó que le extrañaba que el principal Ayala Amely enviara frecuentemente al conserje de la escuela a buscar al niño para llevarlo a la oficina.* Sentencia, pág. 3. Apéndice VIII, pág. 32. Luego de que la madre le contara ese dato al padre del menor, quien había notado al niño abstraído, insomne e inapetente, lo confrontó y logró que le contara lo sucedido con Ayala Amely.

El 26 de enero de 1988 (unos seis (6) días después de ocurridos los hechos), enterados los padres del menor de lo sucedido, presentaron una querella ante la Oficina Regional del Departamento de Instrucción Pública en Mayagüez y otra ante la Policía de Puerto Rico. La denuncia policíaca llevó a la presentación de cargos criminales contra Ayala Amely imputándole el delito de actos lascivos e impúdicos.

Art. 105 del Código Penal, 33 L.P.R.A. sec. 4067. En el caso criminal Ayala Amely se declaró culpable de agresión agravada grave, Art. 95 del Código Penal, 33 L.P.R.A. sec. 4032. Fue sentenciado a cumplir dos (2) años de reclusión bajo los beneficios de una sentencia suspendida. Ley Núm. 259 de 3 de abril de 1946 (34 L.P.R.A. secs. 1026–1029).

El 26 de enero de 1988 el Superintendente de Escuelas solicitó al Departamento de Instrucción Pública una investigación de la conducta de Ayala Amely *al catalogar de "acusaciones muy serias" las hechas por el guardia Morales Lugo en su informe.* Ya había acaecido los hechos por los cuales aquí se reclama responsabilidad al E.L.A. *La investigación administrativa culminó con la destitución de Ayala Amely de su puesto en el Departamento de Instrucción Pública.*

Así las cosas, el 4 de febrero de 1988, los padres del menor, por sí y en representación del niño, instaron demanda en la que reclamaron indemnización por los daños y perjuicios alegadamente sufridos por las acciones u omisiones de Ayala Amely y del Estado Libre Asociado, patrono de Ayala Amely.

Contestada la demanda, el Estado presentó como defensas afirmativas su inmunidad por los actos intencionales y/o maliciosos de sus funcionarios, empleados y/o subalternos que sean constitutivos de delito, Art. 2 de la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. sec. 3077), y que:

3. Con anterioridad a la fecha en que ocurrieron los hechos el Departamento de Instrucción Pública *no tuvo conocimiento de conducta indecorosa y obscena observada por el codemandado José Manuel Ayala Amely. Tampoco se había presentado querella formal alguna al respecto, ante los organismos rectores del citado Departamento.*

4. El Departamento de Instrucción Pública actuó diligentemente ejercitando su deber de previsión y cuidado al relevar de su puesto al codemandado José Manuel Ayala Amely, una vez se enteró de la alegada conducta indecorosa y obscena que se le imputa en la demanda. (Énfasis suplido.) Apéndice II, pág. 6.

El codemandado Ayala Amely contestó la demanda e instó reconvención, imputando a los demandantes la presentación de una acción libelosa en su contra.

Celebrado el juicio en su fondo, el foro de instancia dictó sentencia y declaró sin lugar la demanda respecto al Estado Libre Asociado y con lugar respecto al codemandado Ayala Amely. De la desestimación en contra del Estado acuden los demandantes ante nos.

## II

No existe controversia sobre los daños sufridos por el menor R.M.S.F. y sus padres a consecuencia de los hechos que motivaron esta acción. Al respecto el foro de instancia determinó, como cuestión de hecho, que:

> Quedó demostrado fuera de toda duda que los hechos anteriormente expuestos fueron eventos sumamente traumatizantes para el menor que han requerido tratamiento psicoterapéutico desde entonces. Como consecuencia de lo sucedido [R.M.S.F.][2] sintió una gran vergüenza y, a su vez, una gran furia. A veces ha sentido deseos de matar a Ayala Amely aun cuando una de sus mayores preocupaciones es que sea su padre, y no él, quien lo mate.
>
> Según sus propias palabras, [R.M.S.F.] rechazaba todo tipo de "fresquería" y resiente que Ayala Amely lo haya tocado. (Declaró que ni su padre ni su madre le habían visto el pene y no permitían que nadie tocara a [R.M.S.F.]).
>
> La salud emocional de [R.M.S.F.] se vio profundamente afectada. No sale del cuarto, no sale de la casa ya no se relaciona con amigos porque éstos lo molestan (el asunto es de público conocimiento en su comunidad) y le ponen otros nombres. "Becerrito" le dicen unos porque, según [R.M.S.F.] las vacas, al parir, lamen a sus becerritos. También ha tenido que pelear a los puños con motivo de situaciones como ésta. A raíz de los hechos no podía dormir.
>
> La prueba pericial demostró que [R.M.S.F.] padece de un desorden de ansiedad por estrés postraumático que consiste de una mezcla de vergüenza, angustia y coraje. Tiene episodios

---

[2] Para protección de la identidad de este menor utilizamos las iniciales de su nombre.

oníricos que se asocian con miedo a recibir daño de su medioambiente.

Quedó igualmente demostrado que [R.M.S.F.] es muy vulnerable, es sensible, busca el cariño, se paraliza ante situaciones de estrés *y no sabe resistirse ante la autoridad. Tiene las características para ser víctima de sucesos como los de este caso.*

En este momento es impredecible el efecto a largo plazo que tendrá este evento en su vida y salud futura. La psicoterapista teme, sin embargo, que por ser [R.M.S.F.] un adolescente que está en pleno proceso de afirmar su identidad puede resultar negativo especialmente en lo que respecta a sus relaciones con personas del sexo opuesto. [R.M.S.F.] continúa bajo tratamiento.

Por su parte los padres de [R.M.S.F.] también sufrieron daños. El padre de [R.M.S.F.], Manuel Soto Rivera ("don Manuel") ha sufrido grandemente con toda la situación. Con voz trémula y lágrimas en los ojos declaró sobre el inmenso dolor que le ocasionó conocer la verdad de lo sucedido. Han sido muchas las noches en que casi no ha podido dormir. Se siente preocupado por el futuro de su hijo. También teme que éste pueda darle rienda suelta al instinto de matar a Ayala Amely. No puede borrar eso de su mente.

Don Manuel expresa que se siente lastimado, triste y avergonzado cada vez que alquien le pregunta por "el caso" de [R.M.S.F.]. Eso le sucede frecuentemente. También sufrió mucho al ver cómo [R.M.S.F.] se afectó con la situación; al verlo cambiar de un muchacho normal y con amigos a uno retraído, triste y sin amistades.

Por su parte, la madre de [R.M.S.F.], Evelyn Fraticelli Rivera ("doña Evelyn"), también sufrió intensamente. Ella y [R.M.S.F.] lloraron juntos la desgracia. Fue un duro golpe para ella que confiaba mucho en Ayala Amely. Vio cómo [R.M.S.F.] se consumía con ese pesar, no comía ni dormía mucho. [R.M.S.F.] se desvelaba algunas noches y la llamaba con pesadillas; ella tenía que acompañarlo para que se tranquilizara.

Actualmente siente miedo de que Ayala Amely ataque al niño o que éste vaya a tomar venganza contra Ayala Amely. Su sufrimiento no ha terminado. (Énfasis suplido.) Apéndice VIII, págs. 32–34.

## III

La demanda que los recurrentes han presentado contra el Estado está predicada en dos (2) postulados distintos. En primer lugar, reclaman responsabilidad vicaria del Es-

tado por la conducta observada por su empleado Ayala Amely hacia el menor *el día de los hechos,* esto es, por la *acción negligente o culposa de dicho empleado.* En segundo lugar, reclaman responsabilidad vicaria del Estado por la conducta dejada de observar por otros empleados de éste (autoridades escolares, Superintendente, etc.) *al no investigar a tiempo la denuncia del guardia escolar sobre conducta sexual desviada y otros incidentes,* observada por Ayala Amely *tres (3) meses antes del día de los hechos, esto es, por la omisión del E.L.A. en tomar acción afirmativa sobre tal querella y por su maestra no informar de la conducta de Ayala Amely con respecto al menor, conducta que era preocupante y poco común del Principal de los niveles superiores de la escuela.*

Coincido con la opinión disidente del Juez Asociado Señor Fuster Berlingeri, a la cual se une el Juez Presidente Señor Andréu García, en el análisis que hace la doctrina de *Piñeiro Manzano v. E.L.A.,* 102 D.P.R. 795 (1964)

En situaciones en las que la función pública es discrecional o altamente valorativa de política pública, el Estado está inmune y no responde por los actos o las omisiones negligentes de sus funcionarios o empleados. Pero, cuando se trata de una función rutinaria de día a día, el Estado sí responde. *Piñeiro Manzano v. E.L.A.,* supra. *Es precisamente de esta última de la cual trata este caso.* Los demandantes recurrentes reclaman responsabilidad al Estado predicada *en la falta de diligencia de las autoridades escolares al no investigar adecuadamente la conducta de Ayala Amely,* de la cual tenían conocimiento previo a los hechos.

Al Estado se le imputa negligencia al no tomar acción afirmativa e investigar las querellas que el guardia de la escuela elemental había hecho contra el Principal —y llevadas al conocimiento de las autoridades escolares— imputándole conducta inapropiada en el desempeño de sus funciones, y por el conocimiento que su maestra y otros empleados escolares tenían de tal conducta.

En *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 308 (1990), señalamos:

> *En el caso de las omisiones, la ocurrencia de éstas sólo dan lugar a una causa de acción en los casos en que exista un deber de actuar.* J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, pág. 80. Para que ocurra un acto negligente como resultado de una omisión tiene que existir un deber de cuidado impuesto o reconocido por ley, y que ocurra el quebrantamiento de ese deber. (Énfasis suplido.) H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 183.

Claro está, además del deber de cuidado impuesto o reconocido en la ley, existe el deber de cuidado general impuesto por las circunstancias particulares del caso. Ese deber de actuar viene impuesto por la naturaleza de la actividad, el riesgo de causar daños, las circunstancias particulares de los afectados y los intereses públicos involucrados.

Cierto es que "no existe ley o reglamento aplicable que le ordene a los funcionarios de las agencias gubernamentales realizar investigaciones administrativas automáticamente a la menor insinuación de una posible actuación impropia de un empleado o funcionario público" en su empleo, *pero cuando las circunstancias y la gravedad de la queja, el riesgo implicado en el caso específico, la naturaleza de la actividad pública, la enseñanza de nivel elemental y las circunstancias de las personas afectadas proveen una base razonable para concluir que dicho empleado o funcionario está incurriendo en una seria violación a las normas institucionales y a los derechos de los beneficiarios del derecho a la educación, el deber de prever en forma general exige que se proceda a investigar la queja y tomar las medidas cautelares, que exijan las circunstancias, para evitar probables consecuencias dañinas razonablemente previsibles.* No hacerlo es un claro abuso del grado tolerable de *abuso de discreción* de dichos funcionarios y expone al Estado a res-

ponder por tales daños. *El alto grado de protección social de nuestros niños no tolera una equivocación crasa o temeraria en las funciones investigativas en tales circunstancias. Cf. Hernández v. E.L.A.*, 116 D.P.R. 293 (1985). De hecho, el Reglamento del Departamento de Instrucción Pública Núm. 344 de 31 de agosto de 1968 (18 R. & R.P.R. sec. 31-174) dispone que:

Cualquier alumno de las escuelas públicas de Puerto Rico que se creyere víctima de alguna injusticia deberá quejarse a su profesor, *y si la queja fuere contra su profesor, principal auxiliar o principal, deberá dirigirse al superintendente de escuelas del distrito, de cuya decisión podrá apelar, si necesario fuese, al Secretario de Instrucción Pública*; pero en ningún caso podrá el alumno abandonar la escuela y conservar al mismo tiempo su calidad de alumno de ella.

*Los alumnos de las escuelas públicas de Puerto Rico tendrán derecho a quejarse y a protestar* con el respeto y decoro debidos *de los actos de sus profesores y principales*, o principales auxiliares, pero deberán permanecer en la escuela *hasta que tales quejas o protestas hayan sido investigadas y resueltas*; y mientras permanezcan en la escuela deberán conducirse con respeto y obediencia. (Énfasis suplido.)[3]

Mayor obligación de investigar y resolver se le impone a las autoridades escolares *cuando quien se queja y protesta de los actos del Principal de una escuela pública es el guardia del Cuerpo de Seguridad Escolar del plantel.* A dicho funcionario la ley le impone el deber de proteger la vida y propiedad de la comunidad escolar, 18 L.P.R.A. sec. 141d(a); vigilar y proteger la seguridad y el orden público en la escuela y sus alrededores, 18 L.P.R.A. sec. 141d(b); hacer cumplir las leyes del E.L.A., 18 L.P.R.A. sec. 141d(d), así como los reglamentos y las normas del Departamento de Instrucción Pública, 18 L.P.R.A. sec. 141d(e)(7). Pero,

---

[3] El Reglamento del Departamento de Instrucción Pública Núm. 344 de 31 de agosto de 1968 fue sustituido en parte por el Reglamento de Estudiantes del Sistema de Instrucción Pública, Departamento de Instrucción Pública, de 10 de noviembre de 1988, Art. V(A) y (B). Este artículo fue enmendado el 7 de diciembre de 1989.

sobre todo, a este cuerpo policíaco el Estado le impone el deber de "[d]esarrollar un sistema que garantice la prevención y la no comisión de actos delictivos dentro y en los alrededores de los planteles escolares ...". 18 L.P.R.A. sec. 141d(c). Para ello, actúa en coordinación con las autoridades escolares y, por ello, sus querellas deben ser atendidas por éstas con la diligencia que las circunstancias ameriten.

En *Estremera v. Inmobiliaria Rac., Inc.*, 109 D.P.R. 852, 856 (1980), advertimos que existen ciertas actividades, tales como las llevadas a cabo por las escuelas, que por su naturaleza esencial vienen "obligados a ofrecer un grado de protección y seguridad independiente del que puedan proveer las agencias de seguridad pública".

Al aplicar esta norma a la responsabilidad de la Universidad de Puerto Rico por los daños sufridos por una estudiante universitaria debido a la conducta criminal intencional (agresión sexual) perpetrada dentro de sus facilidades por un tercero extraño, resolvimos en *Elba A.B.M. v. U.P.R.*, supra, pág. 314, que:

El grado de seguridad que viene obligada a ofrecer una institución educativa depende de *la naturaleza de la institución, su localización y de la manera en que funciona y ofrece sus servicios.* (Énfasis suplido.)

Las escuelas públicas, a tenor con la Ley Núm. 26 de 5 de junio de 1985 (18 L.P.R.A. sec. 141 *et seq.*), proveen protección a sus estudiantes, independiente de la que brinda la Policía estatal, a través del Cuerpo de Seguridad Escolar implantado por dicha ley. La Ley Núm. 26, *supra*, dispuso, como política pública, que:

Por cuanto ha sido siempre política del Estado Libre Asociado de Puerto Rico el *velar y proteger la salud y el bienestar de los menores*; por cuanto, en la mayoría de los casos ha sido y es el sistema de instrucción pública quien acoge los estudiantes de las escuelas públicas del país durante una parte considerable del día; por cuanto, *se ha venido experimentado [sic] en nuestra Isla un continuo aumento en la criminalidad y en los sucesos de*

*violencia y de vandalismo que han ocurrido en los planteles escolares recientemente*, se hace por tanto *urgente y necesario* crear un cuerpo de orden público bajo la dirección del Secretario de Instrucción Pública *para la más eficaz protección de la seguridad de los estudiantes, maestros, personal no docente así como de las facilidades físicas escolares.* (Énfasis suplido.) 18 L.P.R.A. sec. 141.

El Cuerpo de Seguridad Escolar es un "cuerpo de seguridad independiente" de la Policía de Puerto Rico, adscrito al Departamento de Instrucción Pública, 18 L.P.R.A. sec. 141b, pero que funciona en coordinación con la Policía estatal y la Guardia Municipal para prevenir y combatir el crimen. 18 L.P.R.A. sec. 141e. Sus facultades están claramente delimitadas en la ley. 18 L.P.R.A. sec. 141d.

En el caso de autos, el incumplimiento del deber de brindar protección a los estudiantes no provino de un miembro del Cuerpo de Seguridad Escolar. El guardia adscrito a dicho cuerpo cumplió a la saciedad con sus deberes e informó, por escrito, las fallas que encontró en la Escuela Laura Mercado a las autoridades escolares encargadas de investigar la conducta y las ejecutorias dentro del plantel de las personas bajo su jurisdicción, en especial del Principal de la escuela intermedia y superior Ayala Amely. La controversia no es, por lo tanto, si el Estado incumplió su deber de proveer un grado de protección y seguridad, independiente del provisto por las agencias de seguridad pública. *El "issue" es si el Estado incumplió con su deber de investigar unas quejas producto de la implantación del sistema de seguridad independiente, esto es, producto de los hallazgos de un miembro del Cuerpo de Seguridad Escolar.*

Para determinar la negligencia del Estado, si alguna, debemos primeramente atenernos a la naturaleza de la relación entre las autoridades escolares y sus supervisados, y las circunstancias de los protagonistas de esa relación. 31 L.P.R.A. sec. 3021.

La negligencia en que incurren las autoridades escola-

res depende de que éstas hayan omitido desplegar aquella diligencia necesaria para investigar las quejas que sobre sus supervisados se han presentado y que ponen en riesgo la adecuada protección y seguridad de sus estudiantes, tomando en consideración "las circunstancias de las personas, del tiempo y del lugar". Art. 1057 del Código Civil, 31 L.P.R.A. sec. 3021.

¿Era razonablemente previsible la ocurrencia de los hechos y sus consecuencias dañinas que dan base a esta acción? ¿Era el riesgo implicado de tal naturaleza que las autoridades escolares debían anticipar esos resultados dañosos? ¿Ejercieron las autoridades escolares aquella diligencia debida, que el hombre prudente y razonable ejercería, ante el peligro presente en las circunstancias de este caso? Estas son las interrogantes que debemos contestar antes de determinar si el E.L.A. fue negligente en este caso.

Aquí las autoridades escolares no ejercieron la diligencia debida frente a las quejas del guardia escolar. Estas quejas, de variada índole, imputaban al principal de la escuela serias irregularidades en el cumplimiento de sus deberes de supervisión y administración de la Escuela Laura Mercado del poblado Rosario de Mayagüez. Veamos.

Entre los deberes del director de escuelas se encuentra el mantener la buena disciplina, 18 R. & R.P.R. sec. 31-41(15), "conduciéndose ellos mismos con propiedad" dentro de la escuela, 18 R. & R.P.R. sec. 31-41(8); no permitir la entrada de personas ajenas al plantel excepto con el permiso escrito del Secretario de Instrucción Pública, 18 R. & R.P.R. sec. 31-41(9).

Según el informe del guardia, el Principal Ayala Amely permitía la entrada de estudiantes de su preferencia en estado de embriaguez al plantel escolar, en claro incumplimiento de su deber de velar por la disciplina. *Peor aún, no aceptaba la intervención del guardia para solucionar la situación, todo ello en clara interferencia con los deberes del*

*guardia.* Del mismo modo, dejaba que los estudiantes humillaran al guardia en claro menoscabo de la autoridad de ese funcionario. La interferencia con los deberes del guardia, según el informe, *llevó al principal a acudir a los tribunales para abogar por jóvenes transgresores y lograr el archivo de las denuncias presentadas contra éstos.* También permitía la entrada ilegal de jóvenes ajenos a la escuela a los predios del plantel, todo ello en violación a la ley y a los deberes de su puesto.

En el caso de autos era previsible que la inacción de las autoridades escolares frente a las quejas del guardia probablemente desembocaran en daños hacia los estudiantes de la escuela. *No sólo era previsible que el propio Principal. podía causar daño a uno de sus estudiantes,* sino que un tercero ajeno a la escuela pudiera causarlos dado el hecho de la conducta permisiva del Director hacia la entrada de estas personas al plantel. *Aquí el informe del guardia señalaba cómo la imputación de conducta sexual desviada al principal había permitido que un joven intervenido por el guardia saliera impune de sanción, aun cuando un maestro había presentado la queja ante el guardia y el Principal.*

Del mismo modo, podía un hombre prudente y razonable anticipar que el Principal probablemente saciaría su apetito sexual con uno de los niños de la escuela, como efectivamente ocurrió meses más tarde.

Cabe señalar que las autoridades escolares tenían conocimiento del informe con tres (3) meses de antelación a la fecha de los hechos. Tan conscientes eran que, a raíz del informe del guardia escolar, el propio Superintendente de Escuelas, Sr. Ángel Pablo Toledo, visitó la Escuela Laura Mercado para indagar con los empleados del plantel la veracidad de las imputaciones. *Sin embargo, este funcionario entendió que no era necesario someter al Principal al procedimiento disciplinario pues, según él, la conducta homosexual del Principal era de difícil comprobación.* En su lu-

gar, decidió trasladar al guardia. Su investigación superficial fue inadecuada.

La retención del Principal en la escuela representaba un peligro significativo de causar daños a cualquier estudiante, empleado u otra persona bajo su autoridad. *Cf. Morrison v. State Board of Education*, 461 P.2d 375, 391 (Cal. 1969).

En Estados Unidos los tribunales han resuelto que cuando la conducta homosexual de un maestro adviene pública, aumenta la posibilidad de notoriedad y conlleva un disloque en el funcionamiento del salón de clases y una disminución de la efectividad de la enseñanza del maestro. *Gaylord v. Tacoma School District No. 10*, 85 Wash. 2d 348, 535 P.2d 804; 434 U.S. 879 (1977) *cert.* denegado.

Además, existe una relación especial entre el estudiante y la escuela que le impone a ésta un deber de protección particular. *Shaney v. Winnebago County Department of Social Services*, 109 S. Ct. 998 (1989), comentado en Notas, *Children: When Teachers Sexually Abuse Children: The School District's Duty to Investigate*, 43 Okla. L. Rev. 687 (1990).

Recuérdese que el maestro de *escuela elemental* constituye un modelo en el desarrollo de la personalidad del niño. M. Schneider-Vogel, *Gay Teachers in the Classroom: A Continuing Constitutional Debate,* 15 J.L. & Educ. 285 (1986); *Developments in the Law—Sexual Orientation and the Law*, 102 Harv. L. Rev. 1509 (1989); D. Johnson, *Survey of School Principals Regarding Alleged Homosexual Teachers in the Classroom: How likely (Really) Is Discharge?*, 10 U. Dayton L. Rev. 599 (1984–1985); R. Rubenstein y P. Froy, *Of a Homosexual Teachers; Beneath the Mainstream of Constitutional Equalities,* 6 Tex. L. Rev. 183 (1978).

Claro está, nuestra decisión de hoy no pasa juicio sobre el tema del homosexualismo propiamente, sino que se fundamenta en los hechos particulares de este caso en el cual obviamente hubo negligencia de parte de los funcionarios

públicos involucrados al no investigar adecuadamente un patrón de conducta de un principal contrario a la reglamentación vigente. Dicha negligencia fue la causa de los daños causados al menor.

*Pero, aún hay más.*

En *la relación de hechos destacamos que el nivel elemental al cual pertenecía el menor R.M.S.F. estaba a cargo de una directora o principal*, y el nivel intermedio y superior, a cargo de Ayala Amely. Días después de los hechos, la madre del menor acudió a la escuela a buscar las notas de éste y *su maestra (del nivel elemental)* le comentó que le "*extrañaba*" que el Principal (de la intermedia y superior) Ayala Amely enviara *frecuentemente al conserje* de la escuela a buscar el niño para llevarlo a la oficina y utilizarlo en otras tareas.

La maestra, que tenía conocimiento de estos hechos frecuentes y que tenía bajo su responsabilidad al menor, tenía el *deber* de investigar por qué *frecuentemente* el Principal de la *escuela intermedia y superior enviaba a un empleado (conserje) de la escuela a buscar al menor para llevarlo a su oficina*. El deber es patente cuando ella sostuvo que tal actuación le *extrañaba*. Su omisión de no informar e investigar constituyó de por sí negligencia y ciertamente, de haber actuado afirmativamente y haber prohibido que el menor bajo su supervisión en el nivel fuera requerido por un principal de la escuela intermedia y superior, sin explicación alguna en el horario regular de clases y sin autorización de su maestra, pudo haber evitado el que ocurrieran los hechos de este caso. La relación causal entre esta omisión de su obligación clara y el daño causado al menor es patente.

Todos estos factores nos llevan a concluir que las autoridades escolares incumplieron negligentemente con su deber de ofrecer una protección adecuada a los estudiantes al no ejecutar sus *funciones rutinarias* de investigar las quejas sobre la conducta del principal.

Ahora bien, para que exista responsabilidad del Estado por la omisión negligente de sus funcionarios o empleados, es necesario que entre el daño causado y la negligencia de éstos exista relación causal, esto es, que el daño ocasionado haya sido previsible y evitable de haberse realizado a tiempo la acción omitida. *Cf. Rodríguez v. Colón Colón*, 103 D.P.R. 493, 499-501 (1975); *Negrón v. Orozco Rivera*, 113 D.P.R. 712 (1983); *Hernández v. E.L.A.*, 116 D.P.R. 293 (1985).

Por un lado, de haberse realizado a tiempo la investigación de la conducta del Principal, no nos queda duda que el ataque sexual del que fue víctima el menor pudo haberse evitado. La conducta observada por Ayala Amely, según descrita por el guardia en su informe, justificaba que el asunto fuera sometido al procedimiento disciplinario. *Cf.: Sarac v. State Board of Education*, 57 Cal. Rptr. 69 (1967); *Morrison v. State Board of Education*, supra.

De investigarse y someterse al procedimiento disciplinario las quejas del guardia relacionadas con la conducta en el plantel del Principal Ayala Amely, quien cae dentro del servicio de carrera, éste podía enfrentar cargos que podían culminar en su destitución del servicio.

Los tres (3) meses que tuvo el Departamento de Instrucción para iniciar y concluir su investigación eran más que suficientes para resolver el problema de la Escuela Laura Mercado. Aun cuando no se hubiera concluido el procedimiento disciplinario en ese término, sin duda que su iniciación tendrá un efecto paralizante en la conducta desviada del Principal, pues con mayor probabilidad éste se abstendría de incurrir en ella conociendo que estaba bajo investigación y sujeto a una posible destitución de su puesto como sanción disciplinaria.

Por otro lado, el conocimiento de la maestra del menor de la anómala conducta del Principal del nivel secundario de la escuela, de requerir frecuentemente a un niño del nivel primario, debió mover a dicha maestra a tomar ac-

ción afirmativa para impedir la continuación de tales requerimientos. Nada impedía que dicha maestra le comunicara la situación a la principal del nivel primario para que ésta evitara esa situación. *Nada de eso se hizo.*

En estas circunstancias debemos concluir que la omisión e inacción de los funcionarios del Departamento de Instrucción Pública fue la causa adecuada de los daños ocasionados por la acción culposa del principal. Por ello, el Estado debe responder solidariamente con el principal por los daños que le fueron ocasionados a los recurrentes.

Por todo lo anterior, concurro con la sentencia que hoy dictamos.

— O —

Opinión disidente del Juez Asociado Señor Fuster Berlingeri, a la cual se une el Juez Presidente Señor Andréu García.

I

Los hechos esenciales de este caso son los que siguen. El demandado recurrido, José Ayala Amely, era el director de los niveles intermedio y superior de enseñanza de la Escuela Laura Mercado del poblado El Rosario, perteneciente al distrito escolar de San Germán. En esa escuela trabajaba también Francisco Morales Lugo como guardia escolar. Desde el primer día que Morales Lugo llegó a la escuela, comenzó a tener problemas con Ayala Amely. Las discrepancias entre el guardia y el director rebasaron los meros resentimientos y se tornaron tan graves que provocaron el traslado temporero del guardia a otra escuela. A raíz de dicho traslado, Morales Lugo remitió un extenso informe al Director Regional de Mayagüez del entonces Departamento de Instrucción Pública, con copia a la Secre-

taria de ese departamento, Sra. Awilda Aponte Roque. En ese informe el guardia describía sus labores en la Escuela Laura Mercado y denunciaba la conducta alegadamente irrespetuosa e indebida del director Ayala Amely contra su persona.

Como parte de ese informe, y bajo el título de "Conducta del Sr. Administrador que pude captar", el guardia escolar, de pasada, incluyó lo siguiente, entre muchas otras observaciones:

> 11– En una ocasión se acercó a m[í] un profesor que tenía un problema con un estudiante para que yo lo llevar[a] donde el director, el profesor me indicó que el estudiante le había comentado que el director no se atrev[í]a a decirle nada porque [é]l sabía que el director era homo[s]e[x]ual. Se habló con el director y se hizo una reunión donde estaba el padre del joven, el director, dos maestros y yo, entonces el profesor le dijo al director el comentario del estudiante y [el director] se tornó un poco ab[oc]hornado y le dijo al estudiante que para [é]l hacer esos comentarios tenía que haber tenido relación con [é]l de esa índole, pero que si [é]l le pedía perdón entonces todo quedaba olvidado y él no le guardaría rencor y todo qued[ó] así. Apéndice VII, pág. 28.

Las autoridades escolares locales no hicieron nada respecto a la aludida mención de la alegada homosexualidad del director. El Superintendente de Escuelas de San Germán no procuró una investigación sobre el particular porque entendía que lo de homosexualidad era un asunto difícil de probar.

Tres (3) meses más tarde, el menor R.M.S.F., que a la sazón tenía catorce (14) años de edad y cursaba el quinto grado en un programa de educación especial de la Escuela Laura Mercado, se sintió enfermo y le pidió y obtuvo permiso del director Ayala Amely para utilizar el cuarto de servicio sanitario. Ello ocurrió en horas de la tarde, después de terminadas las clases.

Al cabo de un rato, el menor salió del cuarto de servicio

sanitario y el director lo invitó a pasar a su oficina.(1) Una vez allí, el director realizó actos lascivos con el menor.

Enterados los padres del menor de los hechos antes relatados, presentaron las correspondientes querellas ante la Policía y el Departamento de Educación. El director fue acusado de cometer actos lascivos contra un menor. Se declaró culpable del delito de agresión agravada grave, delito menor incluido, y obtuvo los beneficios de una sentencia suspendida. El Departamento de Educación lo destituyó de su empleo.

Por los hechos antes relatados, los demandantes recurrentes, Manuel Soto Rivera y Evelyn Fraticelli, por sí y en representación de su hijo menor de edad, presentaron una demanda en daños y perjuicios contra el director Ayala Amely y contra el Estado Libre Asociado de Puerto Rico.

El tribunal de instancia desestimó la demanda contra el Estado Libre Asociado y responsabilizó al director por la suma de cuarenta y cinco mil dólares ($45,000) a favor de los demandantes recurrentes. Éstos acudieron ante nos en revisión, alegando que el tribunal de instancia erró al resolver: (1) que el iniciar un proceso investigativo en las circunstancias de autos es una función discrecional que exime de responsabilidad al Estado Libre Asociado; (2) que la realización de una investigación no hubiese evitado la conducta impropia del director demandado; (3) que el Estado no incumplió su deber de "buen padre de familia" al no iniciar una investigación del director a base del informe del guardia escolar; (4) que aun cuando la conducta del Estado fuese negligente, ésta no tenía relación causal con el daño. Además de estos planteamientos, los recurrentes señalan que el tribunal de instancia erró al no resolver su

---

(1) Con anterioridad a esta ocasión, el menor había tenido contacto amistoso con el director. Éste le había requerido favores al menor y le había ofrecido su ayuda y amistad. El menor lo consideraba su amigo.

argumento sobre la inconstitucionalidad de la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. sec. 3077 *et seq.*).([2])

## II

Es menester resaltar que la reclamación de la parte demandante recurrente contra el Estado Libre Asociado está esencialmente predicada *en la supuesta falta de diligencia de las autoridades escolares al no investigar la alegada "denuncia" de homosexualidad que hizo el guardia escolar en su informe.*([3]) Alegan los recurrentes que si las autoridades escolares hubiesen actuado diligentemente respecto al informe del guardia escolar, realizando una investigación a fondo en torno a ello, se habría evitado el incidente del director con el menor que da lugar a esta acción.

El tribunal de instancia resolvió expresamente que

> ... *la omisión de las autoridades escolares en investigar la supuesta denuncia de homosexualidad,* vista a la luz más favorable para los demandantes, a lo más que puede dar lugar es a una determinación de que el Superintendente de Escuelas de San Germán abusó de su discreción, *lo cual es una actuación excluida expresamente por el Art. 6(b) de la Ley de Pleitos con-*

---

([2]) No procede entrar a considerar la validez de la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. sec. 3077 *et seq.*). Este Tribunal ha resuelto que no entrará a considerar un planteamiento de inconstitucionalidad de una ley cuando los autos son inadecuados para hacer tal determinación. *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958); *Galarza Soto v. E.L.A.,* 109 D.P.R. 179 (1979). Además, aun cuando este Tribunal hubiese estado en posición de resolver el planteamiento de la inconstitucionalidad, éste se debe obviar por el conocido principio de "no entrar a considerar cuestiones constitucionales cuando el caso puede ser resuelto por otros fundamentos". *Pueblo v. Marrero,* 79 D.P.R. 649 (1956); *Molina v. C.R.U.V.,* 14 D.P.R. 295 (1983).

([3]) La acción contra el Estado Libre Asociado se trajo bajo dos (2) supuestos: (1) que el Estado Libre Asociado como patrono del director escolar era responsable vicariamente por los actos de su empleado; (2) que el Estado Libre Asociado era directamente responsable porque las autoridades escolares fueron negligentes al no investigar a tiempo la supuesta denuncia de homosexualidad que hizo el guardia escolar contra el director. El tribunal de instancia correctamente desestimó la acción bajo el primer supuesto, ya que claramente el Estado no responde de los actos delictivos intencionales de sus empleados. *Báez Vega v. E.L.A.,* 87 D.P.R. 67 (1963). Los recurrentes no cuestionan ante nos esta parte de la decisión del tribunal de instancia.

*tra el Estado. 32 L.P.R.A. sec. 3081 (b) [y que dispone] que el Estado no responde de los actos u omisiones de un empleado en el desempeño de una función de carácter discrecional, aun cuando hubiere abuso de discreción* .... (Énfasis suplido.)

Antes de examinar el planteamiento central de si el Estado fue negligente al no investigar la supuesta denuncia de homosexualidad, es menester atender la cuestión de si éste es inmune. ¿Tiene razón el tribunal de instancia al concluir que la función de realizar una investigación administrativa de un empleado gubernamental con miras a su posible suspensión o destitución es una de carácter propiamente *discrecional*, para los fines de ley que regula la inmunidad del Estado Libre Asociado? ¿O se trata más bien de una función que debe ser considerada como *rutinaria* porque no apareja la formulación de normas de política pública básica, según la definimos en *Piñeiro Manzano v. E.L.A.*, 102 D.P.R. 795 (1974)?

En *Piñeiro Manzano v. E.L.A.*, supra, señalamos que el concepto "función discrecional" es muy amplio y que si nos atuviéramos a su significado literal se protegerían con el manto de inmunidad numerosas actuaciones gubernamentales que el legislador no quiso eximir de responsabilidad. Explicamos allí que "prácticamente toda actuación humana exige algún ejercicio de discreción" (íd., pág. 798) y que la actividad gubernamental comprende diversas clases de actuaciones discrecionales, sin que todas requieran la exclusión de responsabilidad que fija la Ley Núm. 104, *supra*. Reconocimos entonces que le toca a los tribunales concretizar el concepto de "función discrecional" para delimitar qué tipos de demandas contra el Estado están autorizadas y cuáles están excluidas.

Estamos en un área en que la función judicial más bien consiste en formular criterios y señalar los factores que deben evaluarse de acuerdo con las circunstancias particulares de cada caso. "El trazar la línea precisa de demarcación en esta área requiere la

aplicación del método casuístico .... *Piñeiro Manzano v. E.L.A.*, supra, pág. 799.

Si se hace una sinopsis de los pronunciamientos normativos en *Piñeiro Manzano v. E.L.A.*, supra, resulta que para decidir cuáles funciones discrecionales dan lugar a inmunidad y cuáles no eximen al Estado de responsabilidad, el criterio predominante allí expuesto es la distinción entre el ejercicio de discreción en actividades altamente valorativas, que requieren un grado especial de discernimiento gubernamental —como es la formulación de normas de política pública básica— y el ejercicio de discreción en la determinación de cuestiones más bien rutinarias que atañen a la operación normal de día a día del Gobierno. En las primeras es menester inmunizar al Estado para no menoscabar el libre ejercicio de funciones que tradicionalmente han sido parte del ámbito de autonomía de las ramas políticas del Gobierno, como son las funciones de reglamentación y las adjudicativas. Como bien señala el profesor Davis, al citar una notable decisión federal que interpreta la disposición del *Federal Torts Claims Act* homóloga a la nuestra:

> ... the discretionary function exception relates to "policy judgements made by the political branches," with respect to which "the courts generally have no substantive part to play."..."[T]he judiciary confines itself ... to adjudication of facts based on discernable objective standards of law [and] these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." 5 *Davis, Administrative Law Treatise*, págs. 72–73 (2da ed. 1984).

En el caso ante nos, no cabe duda de que el Superintendente de Escuelas tenía discreción para decidir si ordenaba una investigación del informe del guardia escolar.[4] Pero

---

[4] Al momento en que el Superintendente hizo su decisión de no investigar, no existía ley o reglamento que le requiriese realizar una investigación administrativa

conforme a los criterios expresados en *Piñeiro Manzano v. E.L.A.*, supra, no se requería aquí el ejercicio de discreción que está protegido por el manto de inmunidad. La determinación que hizo el Superintendente no es de "aquellas que requieren la evaluación de factores tales como los efectos políticos, económicos y sociales de un plan o de un programa", *Piñeiro Manzano v. E.L.A.*, supra, pág. 801, ni aparejaba la formulación de normas de política pública básica. Se trataba más bien de una decisión del tipo que se hace cotidianamente como parte de la función operacional general de un superintendente de supervisar las labores del personal docente adscrito a su oficina. Ciertamente no era el tipo de decisión gubernamental que tradicionalmente ha gozado de deferencia judicial por tratar sobre asuntos que propiamente no les competen a los tribunales resolver. *Davis*, supra, págs. 60–65. Por lo tanto, debe concluirse que el tribunal de instancia erró al decidir que la determinación del Superintendente de Escuelas de no procurar una investigación del informe del guardia escolar estaba protegida por la inmunidad que consagra la Ley de Reclamaciones y Demandas contra el Estado.

## III

Lo señalado antes, claro está, no dispone totalmente de la controversia de este caso. Es necesario considerar ahora si la conducta del Superintendente fue o no negligente, y si hubo negligencia de ese funcionario, si ésta causó los daños sufridos por el menor y sus padres de modo tal que deba

---

mandatoriamente en un caso como el de autos. La Sec. 10.3 del Reglamento de Personal Docente del Departamento de Instrucción Pública, de 21 de marzo de 1984, señala las causales por las cuales se puede realizar una acción disciplinaria, lo cual presupone la correspondiente investigación previa. Aunque en dicha sección se instituye la "conducta inmoral" como causal de destitución, no se señala el mero hecho de ser homosexual como causal ni existe norma jurídica que disponga que las preferencias homosexuales, sin más, son constitutivas de "conducta inmoral". Para una discusión de lo que este concepto significa para fines de juzgar la actuación de un maestro, véase *Vélez Quiñones v. Srio. de Instrucción*, 86 D.P.R. 755 (1962).

responsabilizarse al Estado Libre Asociado como patrono del Superintendente.

Para evaluar la conducta del Superintendente debemos comenzar aquilatando el informe del guardia escolar. Como señaláramos en la relación de hechos, el informe en cuestión no era de modo alguno ni pretendía ser una denuncia de conducta homosexual de parte del director. Su propósito era desglosar las labores realizadas por el guardia escolar y reseñar una alegada conducta impropia del director hacia éste.

En el referido informe, el guardia en ningún momento afirma que el director era homosexual ni mucho menos que en su relación con los estudiantes varones de la escuela reflejara esa condición o que se comportara impropiamente con éstos. Más aún, según se desprende del párrafo del informe antes transcrito, la breve e indirecta mención de la supuesta homosexualidad del director no era ni siquiera del conocimiento personal del suscribiente. Ni en dicho informe ni en ningún otro documento se declaró que el guardia Morales Lugo tuviese conocimiento personal o motivos fundados para creer que el director fuese homosexual o que sus preferencias sexuales estuviesen poniendo en riesgo la seguridad escolar o incapacitándolo para realizar sus funciones como director. La mención de homosexualidad, pues, era un mero *innuendo*.

Más aun, si hubiese habido una denuncia clara de que el director era homosexual, ello no hubiese sido de por sí razón suficiente para iniciar una investigación. Es menester distinguir la mera *preferencia* homosexual de una persona de aquella *conducta* homosexual suya que atente contra el bienestar de estudiantes menores de edad. La *condición* de homosexual por sí sola no constituye delito o hecho antijurídico alguno. Para que existiese fundamento para considerar si debía o no debía realizarse una investigación, hubiera sido necesario que la denuncia imputase alguna conducta homosexual impropia de parte del direc-

tor, cosa que no fue alegada de modo alguno en el informe en cuestión.

Por último, independientemente del escaso contenido del informe como "denuncia" de homosexualidad, debemos tener presente que el informe provenía de una persona que a todas luces estaba resentida y posiblemente prejuiciada en contra del director, por lo cual cabía pensar que no se trataba de un informante objetivo. Todo ello nos lleva ineludiblemente a concluir que el informe tenía muy poco valor, si alguno, como denuncia de la supuesta conducta homosexual impropia del director, que le requiriese al Superintendente la diligencia de iniciar una pesquisa.

La responsabilidad civil derivada de omisiones culposas o negligentes se rige por lo dispuesto en el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. *Gierbolini v. Employers Fire Ins. Co.*, 104 D.P.R. 853 (1976); *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979).

Dichas omisiones sólo dan lugar a una causa de acción cuando existe un deber correlativo de actuar o de cuidado impuesto o reconocido por ley y ese deber es quebrantado. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. II, Vol. 3, pág. 80; H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 183; *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986), y casos allí citados. Una omisión a sabiendas y voluntariamente constituye negligencia cuando preexiste la obligación legal de obrar. *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970).

Más aún, para que exista responsabilidad por un daño causado por una omisión negligente es necesario que exista una relación causal entre el daño y la omisión, y para que exista esa relación causal es necesario que el daño ocasionado haya podido evitarse de haberse realizado a tiempo la acción omitida. Puig Brutau, *op. cit.*, pág. 97; *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990). La causa es la "condición

que ordinariamente produce el daño, según la experiencia general". *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 704 (1982).

En el recurso ante nos los funcionarios concernidos decidieron no iniciar una investigación ante una alegada "denuncia" sobre una preferencia sexual homosexual del Director de una escuela. El Reglamento de Personal Docente del Departamento de Instrucción Pública, de 21 de marzo de 1984, señala las causas por las cuales se debe iniciar una investigación y el procedimiento de ésta. Entre éstas no se encuentra la "denuncia" de homosexualidad, por lo que no es errado concluir que el Departamento de Educación, a través de sus funcionarios, no tenía una *obligación* o *deber impuesto por ley o reglamento* de iniciar una investigación, particularmente en vista del poco valor que tenía el informe del guardia escolar como "denuncia".

La ausencia de un deber de investigar es clara en este caso aun frente al principio de que el cumplimiento de un estatuto o reglamento no exime, de por sí, de responsabilidad, si ante las circunstancias particulares del caso un hombre prudente y razonable hubiese tomado *precauciones adicionales*, Brau del Toro, *op. cit.*, pág. 176, porque a la luz de los hechos concretos que hemos reseñado un "hombre prudente y razonable", en iguales circunstancias, hubiera concluido que no era necesario iniciar una investigación.

Podría pensarse que las otras imputaciones hechas en el informe del guardia escolar, independientes y distintas del asunto de la homosexualidad, parecían suficientemente graves como para justificar una investigación. Pero ello, aun de ser cierto, no es pertinente aquí ya que la acción de los demandantes está predicada estrictamente en que la negligencia de las autoridades escolares consistió en no investigar la "denuncia" de *homosexualidad.* Esa y no otra es la controversia ante nos. Además, como hemos de señalar más adelante, sería una conjetura impermisible resolver

que por no investigar una conducta del director, que nada tenía que ver con la cuestión de homosexualidad, se hubiera podido evitar el acto homosexual delictivo que éste cometió tres (3) meses más tarde.

En este caso no sólo no existe una omisión negligente o culposa, sino que también está ausente el elemento de relación causal. Sería altamente especulativo suponer que el inicio de una investigación de la alegada "denuncia" hubiese evitado el daño sufrido por el demandante. En este caso, por razones reglamentarias, el inicio de la investigación aludida o de cualquier otra investigación resultante del informe no hubiese conllevado una suspensión del director de su cargo, por la falta de causa para ello.(5) En consecuencia, aun cuando se hubiese iniciado alguna investigación, el director podía seguir en contacto con el menor perjudicado. Además de ello, por lo delicado y complicado que sería un proceso investigativo en estas circunstancias, éste tomaría bastante tiempo, probablemente un periodo de tiempo mayor que el transcurrido entre la "denuncia" y los actos que motivaron la presente causa de acción. No puede afirmarse con certeza que de haberse realizado la investigación se hubiera evitado el daño. Por lo tanto, no hay *nexo causal* entre la omisión y el daño.

En el presente recurso no se dan dos de los tres elementos necesarios para que proceda una causa de acción por responsabilidad civil extracontractual. Los demandantes recurrentes no tenían causa de acción.

Por los fundamentos antes expuestos, confirmaríamos la Sentencia de 22 de febrero de 1989 del tribunal de instancia.

---

(5) La Sec. 10.3 del Reglamento de Personal Docente del Departamento de Instrucción Pública, *supra*, dispone que sólo en los "casos de mal uso de fondos públicos o cuando haya motivos razonables de que existe un *peligro real* para la salud, vida o moral de los empleados o del pueblo en general, se podrá suspender de empleo y sueldo al empleado antes de la determinación final de la acción a seguir". (Énfasis suplido.) Es decir, el inicio de la investigación no hubiese conllevado la separación del empleo de director y, por ende, la separación de los estudiantes, ante unas imputaciones de las que no resulta ni se señala un *peligro real*.